# HIBBS, DIRECTOR, ARIZONA DEPARTMENT OF REVENUE *v.* WINN ET AL.

No. 02–1809.   Argued January 20, 2004—Decided June 14, 2004

90

*Terry Goddard,* Attorney General of Arizona, argued the cause for petitioner. With him on the briefs were *Mary O'Grady,* Solicitor General, *Paula S. Bickett,* and *Joseph Kanefield,* Special Assistant Attorney General.

*Deputy Solicitor General Hungar* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General O'Connor, Kent L. Jones,* and *Kenneth L. Greene.*

*Marvin S. Cohen* argued the cause for respondents. With him on the brief were *Paul Bender* and *Steven R. Shapiro.**

JUSTICE GINSBURG delivered the opinion of the Court.

Arizona law authorizes income-tax credits for payments to organizations that award educational scholarships and tuition grants to children attending private schools. See Ariz.

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Manuel M. Mederios,* State Solicitor General, *Andrea Lynn Hoch,* Chief Assistant Attorney General, *David S. Chaney,* Senior Assistant Attorney General, *Randall P. Borcherding,* Supervising Deputy Attorney General, *Kristian D. Whitten,* Deputy Attorney General, and *Anabelle Rodríguez,* Secretary of Justice of Puerto Rico, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.,* of Alabama, *Gregg D. Renkes* of Alaska, *Mike Beebe* of Arkansas, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Charles J. Crist, Jr.,* of Florida, *Thurbert E. Baker* of Georgia, *Douglas B. Moylan* of Guam, *Mark J. Bennett* of Hawaii, *Lawrence G. Wasden* of Idaho, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Thomas J. Miller* of Iowa, *Richard P. Ieyoub* of Louisiana, *Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Michael A. Cox* of Michigan, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Brian Sandoval* of Nevada, *Peter W. Heed* of New Hampshire, *Peter C. Harvey* of New Jersey, *Patricia A. Madrid* of New Mexico, *Eliot Spitzer* of New York, *Wayne Stenehjem* of North Dakota, *Jim Petro* of Ohio, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Patrick C. Lynch* of Rhode Island, *Henry McMaster* of South Carolina, *Lawrence E. Long* of South Dakota, *Paul G. Summers* of Tennessee, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *Jerry W. Kilgore* of Virginia, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *Peggy A. Lautenschlager* of Wisconsin; for the Council of State Governments et al. by *Richard Ruda* and *James I. Crowley;* and for the Honorable Trent Franks et al. by *Benjamin W. Bull.*

A brief of *amici curiae* urging affirmance was filed for the NAACP Legal Defense & Educational Fund, Inc., by *Elaine R. Jones, Theodore M. Shaw,* and *Norman J. Chachkin.*

A brief of *amici curiae* was filed for Americans United for Separation of Church and State et al. by *Ayesha N. Khan, Elliot M. Mincberg,* and *Judith E. Schaeffer.*

Rev. Stat. Ann. § 43–1089 (West Supp. 2003). Plaintiffs below, respondents here, brought an action in federal court challenging § 43–1089, and seeking to enjoin its operation, on Establishment Clause grounds. The question presented is whether the Tax Injunction Act (TIA or Act), 28 U. S. C. § 1341, which prohibits a lower federal court from restraining "the assessment, levy or collection of any tax under State law," bars the suit. Plaintiffs-respondents do not contest their own tax liability. Nor do they seek to impede Arizona's receipt of tax revenues. Their suit, we hold, is not the kind § 1341 proscribes.

In decisions spanning a near half century, courts in the federal system, including this Court, have entertained challenges to tax credits authorized by state law, without conceiving of § 1341 as a jurisdictional barrier. On this first occasion squarely to confront the issue, we confirm the authority federal courts exercised in those cases.

It is hardly ancient history that States, once bent on maintaining racial segregation in public schools, and allocating resources disproportionately to benefit white students to the detriment of black students, fastened on tuition grants and tax credits as a promising means to circumvent *Brown* v. *Board of Education,* 347 U. S. 483 (1954). The federal courts, this Court among them, adjudicated the ensuing challenges, instituted under 42 U. S. C. § 1983, and upheld the Constitution's equal protection requirement. See, *e. g., Griffin* v. *School Bd. of Prince Edward Cty.,* 377 U. S. 218, 233 (1964) (faced with unconstitutional closure of county public schools and tuition grants and tax credits for contributions to private segregated schools, District Court could require county to levy taxes to fund nondiscriminatory public schools), rev'g 322 F. 2d 332, 343–344 (CA4 1963) (abstention required until state courts determine validity of grants, tax credits, and public-school closing), aff'g *Allen* v. *County School Bd. of Prince Edward Cty.,* 198 F. Supp. 497, 503 (ED Va. 1961) (county enjoined from paying grants or providing

tax credits to support private schools that exclude students based on race while public schools remain closed), and aff'g 207 F. Supp. 349, 355 (ED Va. 1962) (closure of public schools enjoined). See also *Moton* v. *Lambert*, 508 F. Supp. 367, 368 (ND Miss. 1981) (challenge to tax exemptions for racially discriminatory private schools may proceed in federal court).

In the instant case, petitioner Hibbs, Director of Arizona's Department of Revenue, argues, in effect, that we and other federal courts were wrong in those civil-rights cases. The TIA, petitioner maintains, trumps § 1983; the Act, according to petitioner, bars all lower federal-court interference with state tax systems, even when the challengers are not endeavoring to avoid a tax imposed on them, and no matter whether the State's revenues would be raised or lowered should the plaintiffs prevail. The alleged jurisdictional bar, which petitioner asserts has existed since the TIA's enactment in 1937, was not even imagined by the jurists in the pathmarking civil-rights cases just cited, or by the defendants in those cases, litigants with every interest in defeating federal-court adjudicatory authority. Our prior decisions command no respect, petitioner urges, because they constitute mere "sub silentio holdings." Reply Brief for Petitioner 8. We reject that assessment.

We examine in this opinion both the scope of the term "assessment" as used in the TIA, and the question whether the Act was intended to insulate state tax laws from constitutional challenge in lower federal courts even when the suit would have no negative impact on tax collection. Concluding that this suit implicates neither § 1341's conception of assessment nor any of the statute's underlying purposes, we affirm the judgment of the Court of Appeals.

I

Plaintiffs-respondents, Arizona taxpayers, filed suit in the United States District Court for the District of Arizona, challenging Ariz. Rev. Stat. Ann. § 43–1089 (West Supp. 2003) as incompatible with the Establishment Clause. Sec-

tion 43–1089 provides a credit to taxpayers who contribute money to "school tuition organizations" (STOs). An STO is a nonprofit organization that directs moneys, in the form of scholarship grants, to students enrolled in private elementary or secondary schools. STOs must disburse as scholarship grants at least 90 percent of contributions received, may allow donors to direct scholarships to individual students, may not allow donors to name their own dependents, must designate at least two schools whose students will receive funds, and must not designate schools that "discriminate on the basis of race, color, handicap, familial status or national origin." See §§ 43–1089(D)–(F). STOs are not precluded by Arizona's statute from designating schools that provide religious instruction or that give admissions preference on the basis of religion or religious affiliation. When taxpayers donate money to a qualified STO, § 43–1089 allows them, in calculating their Arizona tax liability, to credit up to $500 of their donation (or $625 for a married couple filing jointly, § 43–1089(A)(2)).

In effect, § 43–1089 gives Arizona taxpayers an election. They may direct $500 (or, for joint-return filers, $625) to an STO, or to the Arizona Department of Revenue. As long as donors do not give STOs more than their total tax liability, their $500 or $625 contributions are costless.

The Arizona Supreme Court, by a 3-to-2 vote, rejected a facial challenge to § 43–1089 before the statute went into effect. *Kotterman* v. *Killian*, 193 Ariz. 273, 972 P. 2d 606 (1999) (en banc). That case took the form of a special discretionary action invoking the court's original jurisdiction. See *id.*, at 277, 972 P. 2d, at 610. *Kotterman*, it is undisputed, has no preclusive effect on the instant as-applied challenge to § 43–1089 brought by different plaintiffs.

Respondents' federal-court complaint against the Director of Arizona's Department of Revenue (Director) alleged that § 43–1089 "authorizes the formation of agencies that have as their sole purpose the distribution of State funds to children of a particular religious denomination or to children attend-

ing schools of a particular religious denomination." Complaint ¶ 13, App. 10. Respondents sought injunctive and declaratory relief, and an order requiring STOs to pay funds still in their possession "into the state general fund." *Id.*, at 7–8, App. 15.

The Director moved to dismiss the action, relying on the TIA, which reads in its entirety:

> "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341.

The Director did not assert that a federal-court order enjoining § 43–1089 would interfere with the State's tax levy or collection efforts. He urged only that a federal injunction would restrain the "assessment" of taxes "under State law." Agreeing with the Director, the District Court held that the TIA required dismissal of the suit. App. to Pet. for Cert. 31.

The Court of Appeals for the Ninth Circuit reversed, holding that "a federal action challenging the granting of a state tax credit is not prohibited by the [TIA]." *Winn* v. *Killian,* 307 F. 3d 1011, 1017 (2002). Far from "adversely affect[ing] the state's ability to raise revenue," the Court of Appeals observed, "the relief requested by [respondents] . . . would result in the state's receiving more funds that could be used for the public benefit." *Id.,* at 1017, 1018. We granted certiorari, 539 U. S. 986 (2003), in view of the division of opinion on whether the TIA bars constitutional challenges to state tax credits in federal court. Compare 307 F. 3d, at 1017, with *ACLU Foundation* v. *Bridges,* 334 F. 3d 416, 421–423 (CA5 2003) (TIA bars federal action seeking to have any part of a State's tax system declared unconstitutional). We now affirm the judgment of the Ninth Circuit.

## II

Before reaching the merits of this case, we must address respondents' contention that the Director's petition for cer-

tiorari was jurisdictionally untimely under 28 U. S. C. § 2101(c) and our Rules. See Brief in Opposition 8–13. Section 2101(c) instructs that a petition for certiorari must be filed "within ninety days after the entry of . . . judgment." This Court's Rule 13.3 elaborates:

> "The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice). But if a petition for rehearing is timely filed in the lower court by any party, the time to file the petition for a writ of certiorari for all parties (whether or not they requested rehearing or joined in the petition for rehearing) runs from the date of the denial of the petition for rehearing or, if the petition for rehearing is granted, the subsequent entry of judgment."

Respondents assert that the Director's petition missed the Rule's deadlines: More than 90 days elapsed between the date the Court of Appeals first entered judgment and the date the petition was filed, rendering the filing untimely under the first sentence of the Rule; and because no party petitioned for rehearing, the extended periods prescribed by the Rule's second sentence never came into play.

This case, however, did not follow the typical course. The Court of Appeals, on its own motion, recalled its mandate and ordered the parties to brief the question whether the case should be reheard en banc. That order, we conclude, suspended the judgment's finality under § 2101(c), just as a timely filed rehearing petition would, or a court's appropriate decision to consider a late-filed rehearing petition. Compare *Young* v. *Harper*, 520 U. S. 143, 147, n. 1 (1997) (appeals court agreed to consider a late-filed rehearing petition; timeliness of petition for certiorari measured from date court disposed of rehearing petition), with *Missouri* v. *Jenkins*, 495 U. S. 33, 49 (1990) ("The time for applying for certiorari will

not be tolled when it appears that the lower court granted rehearing or amended its order solely for the purpose of extending that time.").

A timely rehearing petition, a court's appropriate decision to entertain an untimely rehearing petition, and a court's direction, on its own initiative, that the parties address whether rehearing should be ordered share this key characteristic: All three raise the question whether the court will modify the judgment and alter the parties' rights. See *id.*, at 46 ("A timely petition for rehearing . . . operates to suspend the finality of the . . . court's judgment, pending the court's further determination whether the judgment should be modified so as to alter its adjudication of the rights of the parties" (quoting *Department of Banking of Neb.* v. *Pink*, 317 U. S. 264, 266 (1942) *(per curiam);* alterations in original)). In other words, "while [a] petition for rehearing is pending," or while the court is considering, on its own initiative, whether rehearing should be ordered, "there is no 'judgment' to be reviewed." *Jenkins*, 495 U. S., at 46.

In this light, we hold that the Director's petition for a writ of certiorari was timely. When the Court of Appeals ordered briefing on the rehearing issue, 90 days had not yet passed from the issuance of the panel opinion. Because § 2101(c)'s 90-day limit had not yet expired, the clock could still be reset by an order that left unresolved whether the court would modify its judgment. The court-initiated briefing order had just that effect. Because a genuinely final judgment is critical under the statute, we must treat the date of the court's order denying rehearing en banc as the date judgment was entered. The petition was filed within 90 days of that date and was thus timely under the statute.

Were we to read Rule 13 as our sole guide, so that only a rehearing petition filed by a party could reset the statute's 90-day count, we would lose sight of the congressional objective underpinning § 2101(c): An appellate court's final adjudi-

cation, Congress indicated, marks the time from which the period allowed for a certiorari petition begins to run. The statute takes priority over the "procedural rules adopted by the Court for the orderly transaction of its business." *Schacht* v. *United States*, 398 U. S. 58, 64 (1970). When court-created rules fail to anticipate unusual circumstances that fit securely within a federal statute's compass, the statute controls our decision. See, *e. g., Kontrick* v. *Ryan*, 540 U. S. 443, 453 (2004) ("'[I]t is axiomatic' that [court-prescribed procedural rules] 'do not create or withdraw federal jurisdiction.'" (quoting *Owen Equipment & Erection Co.* v. *Kroger*, 437 U. S. 365, 370 (1978))). Because the petition for a writ of certiorari was timely under § 2101(c), we have jurisdiction to decide whether the TIA bars respondents' suit.

## III

To determine whether this litigation falls within the TIA's prohibition, it is appropriate, first, to identify the relief sought. Respondents seek prospective relief only. Specifically, their complaint requests "injunctive relief prohibiting [the Director] from allowing taxpayers to utilize the tax credit authorized by A. R. S. § 43–1089 for payments made to STOs that make tuition grants to children attending religious schools, to children attending schools of only one religious denomination, or to children selected on the basis of their religion." Complaint 7, App. 15. Respondents further ask for a "declaration that A. R. S. § 43–1089, on its face and as applied," violates the Establishment Clause "by affirmatively authorizing STOs to use State income-tax revenues to pay tuition for students attending religious schools or schools that discriminate on the basis of religion." *Ibid.* Finally, respondents seek "[a]n order that [the Director] inform all [such] STOs that . . . all funds in their possession as of the date of this Court's order must be paid into the state general fund." Complaint 7–8, App. 15. Taking account of the prospective nature of the relief requested, does respond-

ents' suit, in 28 U. S. C. § 1341's words, seek to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law"?  The answer to that question turns on the meaning of the term "assessment" as employed in the TIA.[1]

As used in the Internal Revenue Code (IRC), the term "assessment" involves a "recording" of the amount the taxpayer owes the Government.  26 U. S. C. § 6203.  The "assessment" is "essentially a bookkeeping notation." *Laing* v. *United States*, 423 U. S. 161, 170, n. 13 (1976).  Section 6201(a) of the IRC authorizes the Secretary of the Treasury "to make . . . assessments of all taxes . . . imposed by this title."  An assessment is made "by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary."  § 6203.[2] See also M. Saltzman, IRS Practice and Procedure ¶ 10.02, pp. 10–4 to 10–7 (2d ed. 1991) (when Internal Revenue Service (IRS) signs "summary list" of assessment to record amount of tax liability, "the official act of assessment has occurred for purposes of the Code").[3]

---

[1] State taxation, for § 1341 purposes, includes local taxation.  See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4237, pp. 643–644 (2d ed. 1988) ("Local taxes are imposed under authority of state law and the courts have held that the Tax Injunction Act applies to them."); R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1173 (5th ed. 2003) ("For purposes of the Act, local taxes have uniformly been held to be collected 'under State law.'").

[2] Section 301.6203–1 of the Treasury Regulations states that an assessment is accomplished by the "assessment officer signing the summary record of assessment," which, "through supporting records," provides "identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment."  26 CFR § 301.6203–1 (2003).

[3] The term "assessment" is used in a variety of ways in tax law.  In the property-tax setting, the word usually refers to the process by which the taxing authority assigns a taxable value to real or personal property. See, *e. g.*, F. Schoettle, State and Local Taxation: The Law and Policy of Multi-Jurisdictional Taxation 799 (2003) ("ASSESSMENT—The process of

We do not focus on the word "assessment" in isolation, however. Instead, we follow "the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it." *General Dynamics Land Systems, Inc.* v. *Cline,* 540 U. S. 581, 596 (2004) (internal quotation marks omitted). In § 1341 and tax law generally, an assessment is closely tied to the collection of a tax, *i. e.,* the assessment is the official recording of liability that triggers levy and collection efforts.

The rule against superfluities complements the principle that courts are to interpret the words of a statute in context. See 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181–186 (rev. 6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (footnotes omitted)). If, as the Director asserts, the term "assessment," by itself, signified "[t]he entire plan or scheme fixed upon for charging or taxing," Brief for Petitioner 12 (quoting Webster's New International Dictionary of the English Language 166 (2d ed. 1934)), the TIA would not need the words "levy" or "collection"; the term "assessment," alone, would do all the necessary work.

---

putting a value on real or personal property for purposes of a tax to be measured as a percentage of property values. The valuation is ordinarily done by a government official, the 'assessor' or 'tax assessor,' who will sometimes hire a private professional to do the actual valuations."); Black's Law Dictionary 112 (7th ed. 1999) (defining "assessment" as, *inter alia:* "Official valuation of property for purposes of taxation <assessment of the beach house>.—Also termed *tax assessment.* Cf. APPRAISAL."). See also 5 R. Powell, Real Property § 39.02 (M. Wolf ed. 2000). To calculate the amount of property taxes owed, the tax assessor multiplies the assessed value by the appropriate tax rate. See, *e. g.,* R. Werner, Real Estate Law 534 (11th ed. 2002). Income taxes, by contrast, are typically self-assessed in the United States. As anyone who has filed a tax return is unlikely to forget, the taxpayer, not the taxing authority, is the first party to make the relevant calculation of income taxes owed. The word "self-assessment," however, is not a technical term; as IRC § 6201(a) indicates, the IRS executes the formal act of income-tax assessment.

Earlier this Term, in *United States* v. *Galletti*, 541 U. S. 114 (2004), the Government identified "two important consequences" that follow from the IRS' timely tax assessment: "[T]he IRS may employ administrative enforcement methods such as tax liens and levies to collect the outstanding tax," see 26 U. S. C. §§ 6321–6327, 6331–6344; and "the time within which the IRS may collect the tax either administratively *or* by a 'proceeding in court' is extended [from 3 years] to 10 years after the date of assessment," see §§ 6501(a), 6502(a). Brief for United States in *United States* v. *Galletti*, O. T. 2003, No. 02–1389, pp. 15–16. The Government thus made clear in briefing *Galletti* that, under the IRC definition, the tax "assessment" serves as the trigger for levy and collection efforts. The Government did not describe the term as synonymous with the entire plan of taxation. Nor did it disassociate the word "assessment" from the company ("levy or collection") that word keeps.[4] Instead, and in accord with our understanding, the Government related "assessment" to the term's collection-propelling function.

## IV

Congress modeled § 1341 upon earlier federal "statutes of similar import," laws that, in turn, paralleled state provisions proscribing "actions in State courts to enjoin the collection of State and county taxes." S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937) (hereinafter S. Rep.). In composing the TIA's text, Congress drew particularly on an 1867 measure, sometimes called the Anti-Injunction Act (AIA), which bars "any court" from entertaining a suit brought "for the purpose of restraining the assessment or collection of any [federal] tax." Act of Mar. 2, 1867, ch. 169, § 10, 14 Stat.

---

[4] The dissent is of two minds in this regard. On the one hand, it twice suggests that a proper definition of the term "assessment," for § 1341 purposes, is "the entire plan or scheme fixed upon for charging or taxing." *Post*, at 117. On the other hand, the dissent would disconnect the word from the enforcement process ("levy or collection") that "assessment" sets in motion. See *post*, at 117–119.

475, now codified at 26 U. S. C. § 7421(a). See *Jefferson County* v. *Acker*, 527 U. S. 423, 434–435 (1999). While § 7421(a) "apparently has no recorded legislative history," *Bob Jones Univ.* v. *Simon*, 416 U. S. 725, 736 (1974), the Court has recognized, from the AIA's text, that the measure serves twin purposes: It responds to "the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference"; and it " 'require[s] that the legal right to the disputed sums be determined in a suit for refund,' " *ibid.* (quoting *Enochs* v. *Williams Packing & Nav. Co.*, 370 U. S. 1, 7 (1962)).[5] Lower federal courts have similarly comprehended § 7421(a). See, *e. g., McGlotten* v. *Connally*, 338 F. Supp. 448, 453–454 (DC 1972) (three-judge court) (§ 7421(a) does not bar action seeking to enjoin income-tax exemptions to fraternal orders that exclude nonwhites from membership, for in such an action, plaintiff "does not contest the amount of his own tax, nor does he seek to limit the amount of tax revenue collectible by the United States" (footnote omitted)); *Tax Analysts and Advocates* v. *Shultz*, 376 F. Supp. 889, 892 (DC 1974) (Section 7421(a) does not bar challenge to IRS revenue ruling allowing contributors to political candidate committees to avoid federal gift tax on contributions in excess of $3,000 ceiling; while § 7421(a) "precludes suits to restrain the assessment or collection of taxes," the proscription does not apply when "plaintiffs seek not to restrain the Commissioner from collecting taxes, but rather to *require* him to collect *additional* taxes according to the mandates of the law." (emphases in original)).[6]

---

[5] That Congress had in mind challenges to assessments triggering collections, *i. e.,* attempts to prevent the collection of revenue, is borne out by the final clause of 26 U. S. C. § 7421(a), added in 1966: "whether or not such person is the person *against whom* such tax was assessed." (Emphasis added.)

[6] The dissent incorrectly ranks *South Carolina* v. *Regan*, 465 U. S. 367 (1984), with *McGlotten* and *Tax Analysts and Advocates. Post,* at 120–121. See also *post,* at 122. The latter decisions, as the text notes, did not seek to stop the collection of taxes. In contrast, in *South Caro-*

Just as the AIA shields federal tax collections from federal-court injunctions, so the TIA shields state tax collections from federal-court restraints. In both 26 U. S. C. § 7421(a) and 28 U. S. C. § 1341, Congress directed taxpayers to pursue refund suits instead of attempting to restrain collections. Third-party suits not seeking to stop the collection (or contest the validity) of a tax *imposed on plaintiffs*, as *McGlotten*, 338 F. Supp., at 453–454, and *Tax Analysts*, 376 F. Supp., at 892, explained, were outside Congress' purview. The TIA's legislative history is not silent in this regard. The Act was designed expressly to restrict "the jurisdiction of the district courts of the United States over suits relating to the collection of State taxes." S. Rep., p. 1.

Specifically, the Senate Report commented that the Act had two closely related, state-revenue-protective objectives: (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court—usually out-of-state corporations asserting diversity jurisdiction—and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances. *Id.*, at 1–2; see R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1173 (5th ed. 2003) (citing *Rosewell* v. *LaSalle Nat. Bank,* 450 U. S. 503, 522–523, and nn. 28–29, 527 (1981)). See also *Jefferson County*, 527 U. S., at 435 (observing that the TIA was "shaped by state and federal provisions barring anticipatory actions by taxpayers to stop the tax collector from initiating collection proceedings"). In short, in enacting the TIA,

*lina* v. *Regan,* the State's suit aimed to reduce federal revenue receipts: South Carolina sought to enjoin as a violation of its Tenth Amendment rights not "a federal tax exemption," *post*, at 120, but federal income taxation of the interest on certain state-issued bonds. The Court held in that unique suit that § 7421(a) did not bar this Court's exercise of original jurisdiction over the case. 465 U. S., at 381.

Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority. Nowhere does the legislative history announce a sweeping congressional direction to prevent "federal-court interference with all aspects of state tax administration." Brief for Petitioner 20; *post*, at 123.[7]

The understanding of the Act's purposes and legislative history set out above underpins this Court's previous applications of the TIA. In *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), for example, we recognized that the principal purpose of the TIA was to "limit drastically" federal-court interference with "the collection of [state] taxes." *Id.*, at 408–409 (quoting *Rosewell*, 450 U. S., at 522). True, the Court referred to the disruption of "state tax administration," but it did so specifically in relation to "the collection of revenue." 457 U. S., at 410 (quoting *Perez* v. *Ledesma*, 401 U. S. 82, 128, n. 17 (1971) (Brennan, J., concurring in part and dissenting in part)). The complainants in *Grace Brethren Church* were several California churches and religious schools. They sought federal-court relief from an unemployment compensation tax that state law imposed on them. 457 U. S., at 398. Their federal action, which bypassed state remedies, was exactly what the TIA was designed to ward off. The Director and the dissent endeavor to reconstruct *Grace Brethren Church* as precedent for the proposition that the TIA totally immunizes from lower federal-court review "all aspects of state tax administration,

---

[7] The language of the TIA differs significantly from that of the Johnson Act, which provides in part: "The district courts shall not enjoin, suspend or restrain *the operation of, or compliance with*," public-utility rate orders made by state regulatory bodies. 28 U. S. C. § 1342 (emphasis added). The TIA does not prohibit interference with "the operation of, or compliance with," state tax laws; rather, § 1341 proscribes interference only with those aspects of state tax regimes that are needed to produce revenue—*i. e.*, assessment, levy, and collection.

and not just interference with the collection of revenue." Brief for Petitioner 20; see *post*, at 123–124. The endeavor is unavailing given the issue before the Court in *Grace Brethren Church* and the context in which the words "state tax administration" appear.

The Director invokes several other decisions alleged to keep matters of "state tax administration" entirely free from lower federal-court "interference." Brief for Petitioner 17–21; accord *post*, at 124–125. Like *Grace Brethren Church*, all of them fall within § 1341's undisputed compass: All involved plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes). Federal-court relief, therefore, would have operated to reduce the flow of state tax revenue. See *Arkansas* v. *Farm Credit Servs. of Central Ark.*, 520 U. S. 821, 824 (1997) (corporations chartered under federal law claimed exemption from Arkansas sales and income taxation); *National Private Truck Council, Inc.* v. *Oklahoma Tax Comm'n*, 515 U. S. 582, 584 (1995) (action seeking to prevent Oklahoma from collecting taxes State imposed on nonresident motor carriers); *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 105–106 (1981) (taxpayers, alleging unequal taxation of real property, sought, *inter alia*, damages measured by alleged tax overassessments); *Rosewell*, 450 U. S., at 510 (state taxpayer, alleging her property was inequitably assessed, refused to pay state taxes).[8]

Our prior decisions are not fairly portrayed cut loose from their secure, state-revenue-protective moorings. See, *e. g.*,

---

[8] Petitioner urges, and the dissent agrees, that the TIA safeguards another vital state interest: the authority of state courts to determine what state law means. Brief for Petitioner 21; *post*, at 125. Respondents, however, have not asked the District Court to interpret any state law— there is no disagreement as to the meaning of Ariz. Rev. Stat. Ann. § 43–1089 (West Supp. 2003), only about whether, as applied, the State's law violates the Federal Constitution. See *supra*, at 94–95. That is a question federal courts are no doubt equipped to adjudicate.

*Grace Brethren Church,* 457 U. S., at 410 ("If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and *taxpayers might escape the ordinary procedural requirements imposed by state law.* During the pendency of the federal suit *the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.*" (quoting *Ledesma,* 401 U. S., at 128, n. 17 (Brennan, J., concurring in part and dissenting in part); emphases added)); *Rosewell,* 450 U. S., at 527–528 ("The compelling nature of these considerations [identified by Justice Brennan in *Perez*] is underscored by the dependency of state budgets on the receipt of local tax revenues. . . . We may readily appreciate the difficulties encountered by the county should a substantial portion of its rightful tax revenue be tied up in injunction actions.").[9]

In sum, this Court has interpreted and applied the TIA only in cases Congress wrote the Act to address, *i. e.,* cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes. See *supra,* at 105–106. We have read harmoniously the § 1341 instruction conditioning the jurisdictional bar on the availability of "a plain, speedy and efficient remedy" in state court. The remedy inspected in our decisions was not one designed for the universe of plaintiffs who sue the State. Rather, it was a remedy tailormade for taxpayers. See, *e. g., Rosewell,* 450 U. S., at 528 ("Illinois' legal remedy that provides property

---

[9] We note, furthermore, that this Court has relied upon "principles of comity," Brief for Petitioner 26, to preclude original federal-court jurisdiction only when plaintiffs have sought district-court aid in order to arrest or countermand state tax collection. See *Fair Assessment in Real Estate Assn., Inc.* v. *McNary,* 454 U. S. 100, 107–108 (1981) (Missouri taxpayers sought damages for increased taxes caused by alleged overassessments); *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 296–299 (1943) (plaintiffs challenged Louisiana's unemployment compensation tax).

owners paying property taxes under protest a refund with-
out interest in two years is a 'plain, speedy and efficient rem-
edy' under the [TIA]"); *Grace Brethren Church*, 457 U. S., at
411 ("[A] state-court remedy is 'plain, speedy and efficient'
only if it 'provides the taxpayer with a "full hearing and judi-
cial determination" at which she may raise any and all consti-
tutional objections to the tax.'" (quoting *Rosewell*, 450 U. S.,
at 514)).[10]

## V

In other federal courts as well, § 1341 has been read to
restrain state taxpayers from instituting federal actions to
contest their liability for state taxes, but not to stop third
parties from pursuing constitutional challenges to tax bene-
fits in a federal forum. Relevant to the distinction between
taxpayer claims that would reduce state revenues and third-
party claims that would enlarge state receipts, Seventh Cir-
cuit Judge Easterbrook wrote trenchantly:

> "Although the district court concluded that § 1341 ap-
> plies to any federal litigation touching on the subject of
> state taxes, neither the language nor the legislative his-
> tory of the statute supports this interpretation. The
> text of § 1341 does not suggest that federal courts should
> tread lightly in issuing orders that might allow local gov-
> ernments to raise additional taxes. The legislative his-
> tory . . . shows that § 1341 is designed to ensure that
> federal courts do not interfere with states' collection of
> taxes, so long as the taxpayers have an opportunity to
> present to a court federal defenses to the imposition and
> collection of the taxes. The legislative history is filled
> with concern that federal judgments were emptying

---

[10] Far from "ignor[ing]" the "plain, speedy and efficient remedy" proviso,
as the dissent charges, *post*, at 121, we agree that this "codified exception"
is key to a proper understanding of the Act. The statute requires the
State to provide *taxpayers* with a swift and certain remedy when they
resist tax collections. An action dependent on a court's discretion, for ex-
ample, would not qualify as a fitting taxpayer's remedy. Cf. *supra*, at 96.

state coffers and that corporations with access to the diversity jurisdiction could obtain remedies unavailable to resident taxpayers. *There was no articulated concern about federal courts' flogging state and local governments to collect additional taxes.*" *Dunn* v. *Carey,* 808 F. 2d 555, 558 (1986) (emphasis added).

Second Circuit Judge Friendly earlier expressed a similar view of § 1341:

"The [TIA's] context and the legislative history . . . lead us to conclude that, in speaking of 'collection,' Congress was referring to methods similar to assessment and levy, *e. g.*, distress or execution . . . that would produce money or other property directly, rather than indirectly through a more general use of coercive power. Congress was thinking of cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law going to the validity of the particular taxes *imposed upon them* . . . .*" *Wells* v. *Malloy,* 510 F. 2d 74, 77 (1975) (emphasis added).

See also *In re Jackson County,* 834 F. 2d 150, 151–152 (CA8 1987) (observing that "§ 1341 has been held to be inapplicable to efforts to require collection of additional taxes, as opposed to efforts to inhibit the collection of taxes").[11]

----

[11] In conflict with sister Circuits, and at odds with its own prior opinions, the Fifth Circuit, in *ACLU Foundation* v. *Bridges,* 334 F. 3d 416 (2003), recently construed the TIA in the way the Director does here. *Bridges* involved a challenge to tax exemptions for religious activities in several Louisiana statutes. The District Court, in line with earlier Fifth Circuit decisions, held that the TIA did not apply because the plaintiff was not seeking to restrain the "assessment, levy or collection" of state taxes, but to eliminate allegedly unconstitutional tax exemptions. Reversing, the Fifth Circuit ruled that the TIA bars any federal suit seeking to have any portion of a State's tax system declared unconstitutional. *Id.*, at 421–423.

The Director and the United States refer to four other federal-court decisions lending some support for their view that, for § 1341 purposes, no line should be drawn between challenges that would reduce revenues and

Further, numerous federal-court decisions—including decisions of this Court reviewing lower federal-court judgments—have reached the merits of third-party constitutional challenges to tax benefits without mentioning the TIA. See, *e. g., Byrne* v. *Public Funds for Public Schools of New Jersey*, 442 U. S. 907 (1979), summarily aff'g 590 F. 2d 514 (CA3 1979) (state tax deduction for taxpayers with children attending nonpublic schools violates Establishment Clause), aff'g 444 F. Supp. 1228 (NJ 1978); *Franchise Tax Board of California* v. *United Americans for Public Schools*, 419

---

attacks that might augment collections. See Reply Brief for Petitioner 8–9 (citing *Kraebel* v. *New York City Dept. of Housing Preservation and Development*, 959 F. 2d 395 (CA2 1992); *Colonial Pipeline Co.* v. *Collins*, 921 F. 2d 1237 (CA11 1991); *In re Gillis*, 836 F. 2d 1001 (CA6 1988); *United States Brewers Assn., Inc.* v. *Perez*, 592 F. 2d 1212 (CA1 1979)). See also Brief for United States as *Amicus Curiae* 14–15. In two of the cases, taxpayers were seeking relief aimed at lightening their own tax burdens. *Kraebel* held that § 1341 barred a taxpayer's constitutional challenge to a property-tax exemption and abatement scheme. 959 F. 2d, at 400. *Colonial Pipeline* held that a taxpayer's suit seeking a court-ordered redistribution of Georgia's ad valorem tax system, which might have reduced plaintiff's tax bill, implicated § 1341's jurisdictional bar. 921 F. 2d, at 1243. The court did observe, broadly: "[The] requested relief, if granted, . . . would clearly conflict with the principle underlying the [TIA] that the federal courts should generally avoid interfering with the sensitive and peculiarly local concerns surrounding state taxation schemes." *Id.*, at 1242.

*Gillis*, unlike *Kraebel* and *Colonial Pipeline*, was a third-party action. The court declined to decide "[w]hether the [TIA] actually does bar the availability of such relief," but noted that a suit seeking to enhance state revenues may nonetheless fall within § 1341's bar because "the Act is not, by its own language, limited to the *collection* of taxes." 836 F. 2d, at 1005 (emphasis in original). Finally, *Perez* concerned the Butler Act, 48 U. S. C. § 872, a TIA analog applicable to Puerto Rico. Ordering dismissal of the case for want of jurisdiction, the court rested its decision not on statutory construction, but on "underl[ying]" comity concerns, stating: "[A]n order of a federal court requiring Commonwealth officials to collect taxes which its legislature has not seen fit to impose on its citizens strikes us as a particularly inappropriate involvement in a state's management of its fiscal operations." 592 F. 2d, at 1214–1215.

U. S. 890 (1974) (summarily affirming district-court judgment striking down state statute that provided income-tax reductions for taxpayers sending children to nonpublic schools); *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756 (1973) (state tax benefits for parents of children attending nonpublic schools violates Establishment Clause), rev'g in relevant part 350 F. Supp. 655 (SDNY 1972) (three-judge court); *Grit* v. *Wolman*, 413 U. S. 901 (1973), summarily aff'g *Kosydar* v. *Wolman*, 353 F. Supp. 744, 755–756 (SD Ohio 1972) (three-judge court) (state tax credits for expenses relating to children's enrollment in nonpublic schools violate Establishment Clause); *Finlator* v. *Powers*, 902 F. 2d 1158 (CA4 1990) (state statute exempting Christian Bibles, but not holy books of other religions or other books, from state tax violates Establishment Clause); *Luthens* v. *Bair*, 788 F. Supp. 1032 (SD Iowa 1992) (state law authorizing tax benefit for tuition payments and textbook purchases does not violate Establishment Clause); *Minnesota Civil Liberties Union* v. *Roemer*, 452 F. Supp. 1316 (Minn. 1978) (three-judge court) (state law allowing parents of public or private school students to claim part of tuition and transportation expenses as tax deduction does not violate Establishment Clause).[12]

\* \* \*

In a procession of cases not rationally distinguishable from this one, no Justice or member of the bar of this Court ever raised a § 1341 objection that, according to the petitioner in

---

[12] In school desegregation cases, as a last resort, federal courts have asserted authority to direct the imposition of, or increase in, local tax levies, even in amounts exceeding the ceiling set by state law. See *Missouri* v. *Jenkins*, 495 U. S. 33, 57 (1990); *Liddell* v. *Missouri*, 731 F. 2d 1294, 1320 (CA8 1984) (en banc); cf. *Griffin* v. *School Bd. of Prince Edward Cty.*, 377 U. S. 218, 233 (1964). Controversial as such a measure may be, see *Jenkins*, 495 U. S., at 65–81 (KENNEDY, J., concurring in part and concurring in judgment), it is noteworthy that § 1341 was not raised in those cases by counsel, lower courts, or this Court on its own motion.

this case, should have caused us to order dismissal of the action for want of jurisdiction. See *Mueller* v. *Allen*, 463 U. S. 388 (1983) (state tax deduction for parents who send their children to parochial schools does not violate Establishment Clause); *Byrne*, 442 U. S. 907; *United Americans for Public Schools*, 419 U. S. 890; *Committee for Public Ed. & Religious Liberty*, 413 U. S. 756; *Wolman*, 413 U. S. 901; *Griffin*, 377 U. S. 218. Consistent with the decades-long understanding prevailing on this issue, respondents' suit may proceed without any TIA impediment.[13]

For the reasons stated, the judgment of the United States Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE STEVENS, concurring.

In Part IV of his dissent, JUSTICE KENNEDY observes that "years of unexamined habit by litigants and the courts" do not lessen this Court's obligation correctly to interpret a statute. *Post*, at 126. It merits emphasis, however, that prolonged congressional silence in response to a settled interpretation of a federal statute provides powerful support for maintaining the status quo. In statutory matters, judicial restraint strongly counsels waiting for Congress to take the initiative in modifying rules on which judges and litigants have relied. See *BedRoc Limited, LLC* v. *United States*, 541 U. S. 176, 192 (2004) (STEVENS, J., dissenting); *Federal Election Comm'n* v. *NRA Political Victory Fund*, 513 U. S. 88, 100–105 (1994) (STEVENS, J., dissenting); *Commissioner* v. *Fink*, 483 U. S. 89, 101–103 (1987) (STEVENS, J., dissenting); *Runyon* v. *McCrary*, 427 U. S. 160, 189–192

---

[13] In confirming that cases of this order may be brought in federal court, we do not suggest that "state courts are second rate constitutional arbiters." *Post*, at 113. Instead, we underscore that adjudications of great moment discerning no § 1341 barrier, see *supra*, at 93–94, cannot be written off as reflecting nothing more than "unexamined custom," *post*, at 114, or unthinking "habit," *post*, at 126.

(1976) (STEVENS, J., concurring). In a contest between the dictionary and the doctrine of *stare decisis*, the latter clearly wins. The Court's fine opinion, which I join without reservation, is consistent with these views.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

In this case, the Court shows great skepticism for the state courts' ability to vindicate constitutional wrongs. Two points make clear that the Court treats States as diminished and disfavored powers, rather than merely applies statutory text. First, the Court's analysis of the Tax Injunction Act (TIA or Act), 28 U. S. C. § 1341, contrasts with a literal reading of its terms. Second, the Court's assertion that legislative histories support the conclusion that "[t]hird-party suits not seeking to stop the collection (or contest the validity) of a tax *imposed on plaintiffs* . . . were outside Congress' purview" in enacting the TIA and the anti-injunction provision on which the TIA was modeled, *ante*, at 104, is not borne out by those sources, as previously recognized by the Court. In light of these points, today's holding should probably be attributed to the concern the Court candidly shows animates it. See *ante*, at 93 (noting it was the federal courts that "upheld the Constitution's equal protection requirement" when States circumvented *Brown* v. *Board of Education*, 347 U. S. 483 (1954), by manipulating their tax laws). The concern, it seems, is that state courts are second rate constitutional arbiters, unequal to their federal counterparts. State courts are due more respect than this. Dismissive treatment of state courts is particularly unjustified since the TIA, by express terms, provides a federal safeguard: The Act lifts its bar on federal-court intervention when state courts fail to provide "a plain, speedy, and efficient remedy." § 1341.

In view of the TIA's text, the congressional judgment that state courts are qualified constitutional arbiters, and the re-

spect state courts deserve, I disagree with the majority's superseding the balance the Act strikes between federal- and state-court adjudication. I agree with the majority that the petition for certiorari was timely under 28 U. S. C. § 2101(c), see *ante*, at 96–99, and so submit this respectful dissent on the merits of the decision.

I

Today is the first time the Court has considered whether the TIA bars federal district courts from granting injunctive relief that would prevent States from giving citizens statutorily mandated state tax credits. There are cases, some dating back almost 50 years, which proceeded as if the jurisdictional bar did not apply to tax credit challenges; but some more recent decisions have said the bar is applicable. Compare, *e. g.*, *Mueller* v. *Allen*, 463 U. S. 388 (1983); *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756 (1973); *Griffin* v. *School Bd. of Prince Edward Cty.*, 377 U. S. 218 (1964), with, *e. g.*, *ACLU Foundation of La.* v. *Bridges*, 334 F. 3d 416 (CA5 2003); *In re Gillis*, 836 F. 2d 1001 (CA6 1988). While unexamined custom favors the first position, the statutory text favors the latter. In these circumstances a careful explanation for the conclusion is necessary; but in the end the scope and purpose of the Act should be understood from its terms alone.

The question presented—whether the TIA bars the District Court from granting injunctive relief against the tax credit—requires two inquiries. First, the term assessment, as used in § 1341, must be defined. Second, we must determine if an injunction prohibiting the Director of Arizona's Department of Revenue (Director) from allowing the credit would enjoin, suspend, or restrain an assessment.

The word assessment in the TIA is not isolated from its use in another federal statute. The TIA was modeled on the anti-injunction provision of the Internal Revenue Code (Code), 26 U. S. C. § 7421(a). See *Jefferson County* v. *Acker*, 527 U. S. 423, 434 (1999). That provision specifies, and has

specified since 1867, that federal courts may not restrain or enjoin an "assessment or collection of any [federal] tax." 26 U. S. C. § 7421(a) (first codified by Act of Mar. 2, 1867, ch. 169, § 10, 14 Stat. 475). The meaning of the term assessment in this Code provision is discernible by reference to other Code sections. 26 U. S. C. § 1 *et seq.*

Chapter 63 of Title 26 addresses the subject of assessments and sheds light on the meaning of the term in the Code. Section 6201 first instructs that "[t]he Secretary [of the Internal Revenue Service] is . . . required to make the . . . assessments of all taxes . . . imposed by this title . . . ." 26 U. S. C. § 6201(a). Further it provides, "[t]he Secretary shall assess all taxes determined by the taxpayer or by the Secretary . . . ." § 6201(a)(1). Section 6203 in turn sets forth a method for making an assessment: "The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary."

Taken together, the provisions of Title 26 establish that an assessment, as that term is used in § 7421(a), must at the least encompass the recording of a taxpayer's ultimate tax liability. This is what the taxpayer owes the Government. See also *Laing* v. *United States*, 423 U. S. 161, 170, n. 13 (1976) ("The 'assessment,' essentially a bookkeeping notation, is made when the Secretary or his delegate establishes an account against the taxpayer on the tax rolls"). Whether the Secretary or his delegate (today, the Commissioner) makes the recording on the basis of a taxpayer's self-reported filing form or instead chooses to rely on his own calculation of the taxpayer's liability (*e. g.*, via an audit) is irrelevant. The recording of the liability on the Government's tax rolls is itself an assessment.

The TIA was modeled on the anti-injunction provision, see *Jefferson County*, *supra;* it incorporates the same terminology employed by the provision; and it employs that terminology for the same purpose. It is sensible, then, to interpret the TIA's terms by reference to the Code's use of the term.

Cf. *Lorillard* v. *Pons,* 434 U. S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute"). The Court of Appeals, which concluded that an assessment was the official estimate of the value of income or property used to calculate a tax or the imposition of a. tax on someone, *Winn* v. *Killian,* 307 F. 3d 1011, 1015 (CA9 2002), placed principal reliance for its interpretation on a dictionary definition. That was not entirely misplaced; but unless the definition is considered in the context of the prior statute, the advantage of that statute's interpretive guidance is lost.

Furthermore, the court defined the term in an unusual way. It relied on a dictionary that was unavailable when the TIA was enacted; it relied not on the definition of the term under consideration, "assessment," but on the definition of the term's related verb form, "assess"; and it examined only a portion of that term's definition. In the dictionary used by the Court of Appeals, the verb is defined in two ways not noted by the court. One of the alternative definitions is quite relevant—"(2) to fix or determine the amount of (damages, a tax, a fine, etc.)." Compare *ibid.* with Random House Dictionary of the English Language 90 (1979). Further:

> "Had [the panel] looked in a different lay dictionary, [it] would have found a definition contrary to the one it preferred, such as 'the entire plan or scheme fixed upon for charging or taxing.' . . . Had the panel considered tax treatises and law dictionaries . . . it would have found much in accord with this broader definition. . . . Even the federal income tax code supports a broad reading of 'assessment.'" *Winn* v. *Killian,* 321 F. 3d 911, 912 (CA9 2003) (Kleinfeld, J., dissenting from denial of rehearing en banc).

Guided first by the Internal Revenue Code, an assessment under § 1341, at a minimum, is the recording of taxpayers' liability on the State's tax rolls. The TIA, though a federal statute that must be interpreted as a matter of federal law, operates in a state-law context. In this respect, the Act must be interpreted so as to apply evenly to the 50 various state-law regimes and to the various recording schemes States employ. It is therefore irrelevant whether state officials record taxpayer liabilities with their own pen in a specified location, by collecting and maintaining taxpayers' self-reported filing forms, or in some other manner. The recordkeeping that equates to the determination of taxpayer liability on the State's tax rolls is the assessment, whatever the method. The Court seems to agree with this. See *ante*, at 99–102.

The dictionary definition of assessment provides further relevant information. Contemporaneous dictionaries from the time of the TIA's enactment define assessment in expansive terms. They would broaden any understanding of the term, and so the Act's bar. See, *e. g.*, Webster's New International Dictionary 139 (1927) (providing three context relevant definitions for the term assessment: It is the act of apportioning or determining an amount to be paid; a valuation of property for the purpose of taxation; or the entire plan or scheme fixed upon for charging or taxing). See also *United States* v. *Galletti*, 541 U. S. 114, 122 (2004) (noting that under the Code the term assessment refers not only to recordings of tax liability but also to "the calculation . . . of a tax liability," including self-calculation done by the taxpayer). The Court need not decide the full scope of the term assessment in the TIA, however. For present purposes, a narrow definition of the term suffices. Applying the narrowest definition, the TIA's literal text bars district courts from enjoining, suspending, or restraining a State's recording of taxpayer liability on its tax rolls, whether the recordings are made by

self-reported taxpayer filing forms or by a State's calculation of taxpayer liability.

The terms "enjoin, suspend, or restrain" require little scrutiny. No doubt, they have discrete purposes in the context of the TIA; but they also have a common meaning. They refer to actions that restrict assessments to varying degrees. It is noteworthy that the term "enjoin" has not just its meaning in the restrictive sense but also has meaning in an affirmative sense. The Black's Law Dictionary current at the TIA's enactment gives as a definition of the term, "to require; command; positively direct." Black's Law Dictionary 663 (3d ed. 1933). That definition may well be implicated here, since an order invalidating a tax credit would seem to command States to collect taxes they otherwise would not collect. The parties, however, proceed on the assumption that enjoin means to bar. It is unobjectionable for the Court to make the assumption too, leaving the broader definition for later consideration.

Respondents argue the TIA does not bar the injunction they seek because even after the credit is enjoined, the Director will be able to record and enforce taxpayers' liabilities. See Brief for Respondents 16. In fact, respondents say, with the credit out of the way the Director will be able to record and enforce a higher level of liability and so profit the State. *Ibid.* ("The amount of tax payable by some taxpayers would increase, but that can hardly be characterized as an injunction or restraint of the assessment process"). The argument, however, ignores an important part of the Act: "under State law." 28 U. S. C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment . . . of any tax under State law"). The Act not only bars district courts from enjoining, suspending, or restraining a State's recording of taxpayer liabilities altogether; but it also bars them from enjoining, suspending, or restraining a State from recording the taxpayer liability that state law mandates.

Arizona Rev. Stat. Ann. §43–1089 (West Supp. 2003) is state law. It is an integral part of the State's tax statute; it is reflected on state tax forms; and the State Supreme Court has held that it is part of the calculus necessary to determine tax liability. See *Kotterman* v. *Killian,* 193 Ariz. 273, 279, 285, 972 P. 2d 606, 612, 618 (1999). A recording of a taxpayer's liability under state law must be made in accordance with § 43–1089. The same can be said with respect to each and every provision of the State's tax law. To order the Director not to record on the State's tax rolls taxpayer liability that reflects the operation of § 43–1089 (or any other state tax law provision for that matter) would be to bar the Director from recording the correct taxpayer liability. The TIA's language bars this relief and so bars this suit.

The Court tries to avoid this conclusion by saying that the recordings that constitute assessments under § 1341 must have a "collection-propelling function," *ante,* at 102, and that the recordings at issue here do not have such a function. See also *ante,* at 102, n. 4 ("[T]he dissent would disconnect the word [assessment] from the enforcement process"). That is wrong. A recording of taxpayer liability on the State's tax rolls of course propels collection. In most cases the taxpayer's payment will accompany his filing, and thus will accompany the assessment so that no literal collection of moneys is necessary. As anyone who has paid taxes must know, however, if owed payment were not included with the tax filing, the State's recording of one's liability on the State's rolls would certainly cause subsequent collection efforts, for the filing's recording (*i. e.,* the assessment) would propel collection by establishing the State's legal right to the taxpayer's moneys.

## II

The majority offers prior judicial interpretations of the Code's similarly worded anti-injunction provision to support its contrary conclusions about the statutory text. See *ante,* at 102–103. That this Court and other federal courts have

allowed nontaxpayer suits challenging tax credits to proceed in the face of the anti-injunction provision is not at all controlling. Those cases are quite distinguishable. Had the plaintiffs in those cases been barred from suit, there would have been no available forum at all for their claims. See *McGlotten* v. *Connally*, 338 F. Supp. 448, 453–454 (DC 1972) (three-judge court) ("The preferred course of raising [such tax exemption and deduction] objections in a suit for refund is not available. In this situation we cannot read the statute to bar the present suit"). See also *Tax Analysts and Advocates* v. *Shultz*, 376 F. Supp. 889, 892 (DC 1974) ("Since plaintiffs are not seeking to restrain the collection of taxes, and since they cannot obtain relief through a refund suit, [26 U. S. C.] § 7421(a) does not bar the injunctive relief they seek"). The Court ratified those decisions only insofar as they relied on this limited rationale as the basis for an exception to the statutory bar on adjudication. See *South Carolina* v. *Regan*, 465 U. S. 367, 373 (1984) (holding the anti-injunction provision inapplicable to a State's challenge to the constitutionality of a federal tax exemption provision, § 103(a) of the Code (which exempts from a taxpayer's gross income the interest earned on the obligations of any State), as amended by § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 596, because "the [anti-injunction provision] was not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax"). Even that strict limitation was not strict enough for four Members of the Court, one of whom noted "the broad sweep of the [a]nti-[i]njunction [provision]." 465 U. S., at 382 (Blackmun, J., concurring in judgment). The other three Justices went further still. They would have allowed an exception to the anti-injunction provision's literal bar on nontaxpayer suits challenging tax exemption provisions only if due process rights were at stake. See *id.*, at 394 (O'CONNOR, J., concurring in judgment) (*"Bob Jones University's*

recognition that the complete inaccessibility of judicial review might implicate due process concerns provides absolutely no basis for crafting an exception" to the anti-injunction Act for a plaintiff who has "no due process right to review of its claim in a judicial forum").

In contrast to the anti-injunction provision, the TIA on its own terms ensures an adequate forum for claims it bars. The TIA specially exempts actions that could not be heard in state courts by providing an exception for instances "where a plain, speedy, and efficient remedy may [not] be had in the courts of [the] State." 28 U. S. C. § 1341. The TIA's text thus already incorporates the check that *Regan* concluded could be read into the anti-injunction provision even though "[t]he [anti-injunction provision]'s language 'could scarcely be more explicit' in prohibiting nontaxpayer suits like this one." 465 U. S., at 385 (O'CONNOR, J., concurring in judgment) (quoting *Bob Jones Univ.* v. *Simon,* 416 U. S. 725, 736 (1974)). The practical effect is that a literal reading of the TIA provides for federal district courts to stand at the ready where litigants encounter legal or practical obstacles to challenging state tax credits in state courts. And this Court, of course, stands at the ready to review decisions by state courts on these matters.

The Court does not discuss this codified exception, yet the clause is crucial. It represents a congressional judgment about the balance that should exist between the respect due to the States (for both their administration of tax schemes and their courts' interpretation of tax laws) and the need for constitutional vindication. To ignore the provision is to ignore that Congress has already balanced these interests.

Respondents admit they would be heard in state court. Indeed a quite similar action previously was heard there. See *Kotterman* v. *Killian,* 193 Ariz. 273, 972 P. 2d 606 (1999). As a result, the TIA's exception (akin to that recognized by *Regan*) does not apply. To proceed as if it does is to replace Congress' balancing of the noted interests with the Court's.

## III

The Court and respondents further argue that the TIA's policy purposes and relatedly the federal anti-injunction provision's policy purposes (as discerned from legislative histories) justify today's holding. The two Acts, they say, reflect a unitary purpose: "In both . . . Congress directed taxpayers to pursue refund suits instead of attempting to restrain [tax] collections." *Ante*, at 104. See also *ante*, at 105 (concluding that the Act's underlying purpose is to bar suits by "taxpayers who sought to avoid paying their tax bill"); see also Brief for Respondents 18–20. This purpose, the Court and respondents say, shows that the Act was not intended to foreclose relief in challenges to tax credits. The proposition rests on the premise that the TIA's sole purpose is to prevent district court orders that would decrease the moneys in state fiscs. Because the legislative histories of the Acts are not carefully limited in the manner that this reading suggests, the policy argument against a literal application of the Act's terms fails.

Taking the federal anti-injunction provision first, as has been noted before, "[its] history expressly reflects the congressional desire that all injunctive suits against the tax collector be prohibited." *Regan,* 465 U. S., at 387 (O'CONNOR, J., concurring in judgment). The provision responded to "the grave dangers which accompany intrusion of the injunctive power of the courts into the administration of the revenue." *Id.*, at 388. It "generally precludes judicial resolution of all abstract tax controversies," whether brought by a taxpayer or a nontaxpayer. *Id.*, at 392; see also *id.*, at 387–392 (reviewing the legislative history of the anti-injunction provision, its various amendments, and related enactments). Thus, the provision's object is not just to bar suits that might "interrupt 'the process of collecting . . . taxes,'" but "[s]imilarly, the language and history evidence a congressional desire to prohibit courts from restraining any aspect of the tax laws' administration." *Id.*, at 399.

The majority's reading of the TIA's legislative history is also inconsistent with the interpretation of this same history in the Court's earlier cases. The Court has made clear that the TIA's purpose is not only to protect the fisc but also to protect the State's tax system administration and tax policy implementation. *California* v. *Grace Brethren Church*, 457 U. S. 393 (1982), is a prime example.

In *Grace Brethren Church* the Court held that the TIA not only bars actions by individuals to stop tax collectors from collecting moneys (*i. e.*, injunctive suits) but also bars declaratory suits. See *id.*, at 408–410. The Court explained that permitting declaratory suits to proceed would "defea[t] the principal purpose of the Tax Injunction Act: 'to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes.'" *Id.*, at 408–409 (quoting *Rosewell* v. *LaSalle Nat. Bank*, 450 U. S. 503, 522 (1981)). It continued:

> "'If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts.'" *Grace Brethren Church, supra*, at 410 (quoting with approval *Perez* v. *Ledesma*, 401 U. S. 82, 128, n. 17 (1971) (Brennan, J., concurring in part and dissenting in part)).

While this, of course, demonstrates that protecting the state fisc from damage is part of the TIA's purpose, it equally shows that actions that would throw the "state tax adminis-

tration . . . into disarray" also implicate the Act and its purpose. The Court's concern with preventing administrative disarray puts in context its explanation that the TIA's principal concern is to limit federal district court interference with the "collection of taxes." The phrase, in this context, refers to the operation of the whole tax collection system and the implementation of entire tax policy, not just a part of it. While an order interfering with a specific collection suit disrupts one of the most essential aspects of a State's tax system, it is not the only way in which federal courts can disrupt the State's tax system:

"[T]he legislative history of the Tax Injunction Act demonstrates that Congress worried not so much about the form of relief available in the federal courts, as about divesting the federal courts of jurisdiction to interfere with state tax administration." *Grace Brethen Church, supra,* at 409, n. 22.

The Court's decisions in *Fair Assessment in Real Estate Assn., Inc.* v. *McNary,* 454 U. S. 100 (1981), *National Private Truck Council, Inc.* v. *Oklahoma Tax Comm'n,* 515 U. S. 582 (1995) *(NPTC),* and *Rosewell, supra,* make the same point. Though the majority says these cases support its holding because they "involved plaintiffs who mounted federal litigation to avoid paying state taxes," *ante,* at 106, the language of these cases is too clear to be ignored and is contrary to the Court's holding today. In *Fair Assessment,* the Court observed that "[t]he [TIA] 'has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations.' This last consideration was [its] principal motivating force." 454 U. S., at 110 (quoting *Rosewell, supra,* at 522, in turn quoting *Tully* v. *Griffin, Inc.,* 429 U. S. 68, 73 (1976) (other citation omitted)). In *NPTC,* the Court said, "Congress and this Court repeatedly have shown an aversion to federal interference with state tax administration. The passage of the [TIA] in 1937 is one manifestation of this aversion." 515

U. S., at 586 (summing up this aversion, generated also from principles of comity and federalism, as creating a "background presumption that federal law generally will not interfere with administration of state taxes," *id.,* at 588). In *Rosewell,* the Court described the Act's language as "broad" and "prophylactic." 450 U. S., at 524 (majority opinion of Brennan, J.). See also *ibid.* (the TIA was "passed to limit federal-court interference in state tax matters").

The Act is designed to respect not only the administration of state tax systems but also state-court authority to say what state law means. "[F]ederal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts." *Grace Brethren Church, supra,* at 410 (internal quotation marks omitted). See also *Rosewell, supra,* at 527. This too establishes that the TIA's purpose is not solely to ensure that the State's fisc is not decreased. There would be only a diminished interest in allowing state courts to say what the State's tax statutes mean if the Act protected just the state fisc. The TIA protects the responsibility of the States and their courts to administer their own tax systems and to be accountable to the citizens of the State for their policies and decisions. The majority objects that "there is no disagreement as to the meaning of" state law in this case, *ante,* at 106, n. 8. As an initial matter, it is not clear that this is a fair conclusion. The litigation in large part turns on what state law requires and whether the product of those requirements violates the Constitution. More to the point, however, even if there were no controversy about the statutory framework the Arizona tax provision creates, the majority's ruling has implications far beyond this case and will most certainly result in federal courts in other States and in other cases being required to interpret state tax law in order to complete their review of challenges to state tax statutes.

Our heretofore consistent interpretation of the Act's legislative history to prohibit interference with state tax systems

and their administration accords with the direct, broad, and unqualified language of the statute. The Act bars all orders that enjoin, suspend, or restrain the assessment of any tax under state law. In effecting congressional intent we should give full force to simple and broad proscriptions in the statutory language.

Because the TIA's language and purpose are comprehensive, arguments based on congressional silence on the question whether the TIA applies to actions that increase moneys a state tax system collects are of no moment. Contra, *Winn*, 307 F. 3d, at 1017–1018 (relying on *Dunn* v. *Carey*, 808 F. 2d 555, 558 (CA7 1986)); see also *ante*, at 108–109 (relying on *Dunn*). Whatever weight one gives to legislative histories, silence in the legislative record is irrelevant when a plain congressional declaration exists on a matter. "[W]hen terms are unambiguous we may not speculate on probabilities of intention." *Insurance Co.* v. *Ritchie*, 5 Wall. 541, 545 (1867). Here, Congress has said district courts are barred from disrupting the State's tax operations. It is immaterial whether the State's collection is raised or lowered. A court order will thwart and replace the State's chosen tax policy if it causes either result. No authority supports the proposition that a State lacks an interest in reducing its citizens' tax burden. It is a troubling proposition for this Court to proceed on the assumption that the State's interest in limiting the tax burden on its citizens to that for which its law provides is a secondary policy, deserving of little respect from us.

## IV

The final basis on which both the majority and respondents rest is that years of unexamined habit by litigants and the courts alike have resulted in federal courts' entertaining challenges to state tax credits. See *ante*, at 110–111 (citing representative cases). While we should not reverse the course of our unexamined practice lightly, our obligation is to give a correct interpretation of the statute. We are not

obliged to maintain the status quo when the status quo is unfounded. The exercise of federal jurisdiction does not and cannot establish jurisdiction. See *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 37–38 (1952). "[T]his Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio.*" *Id.,* at 38. In this respect, the present case is no different than *Federal Election Comm'n* v. *NRA Political Victory Fund,* 513 U. S. 88 (1994). The case presented the question whether we had jurisdiction to consider a certiorari petition filed by the Federal Election Commission (FEC), and not by the Solicitor General on behalf of the FEC. The Court held that it lacked jurisdiction. See *id.,* at 99. Though that answer seemed to contradict the Court's prior practices, the Court said:

> "Nor are we impressed by the FEC's argument that it has represented itself before this Court on several occasions in the past without any question having been raised about its authority to do so .... The jurisdiction of this Court was challenged in none of these actions, and therefore the question is an open one before us." *Id.,* at 97.

See also *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 63, n. 4 (1989) ("'[T]his Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.' *Hagans* v. *Lavine,* 415 U. S. 528, 535, n. 5 (1974)" (alteration in original)). These cases make clear that our failure to consider a question hardly equates to a thing's being decided. Contra, *ante,* at 112–113 (STEVENS, J., concurring) (referring to prior silences of the courts with respect to the TIA as *stare decisis* and settled interpretation). As a consequence, I would follow the statutory language.

*     *     *

After today's decision, "[n]ontaxpaying associations of taxpayers, and most other nontaxpayers, will now be allowed to sidestep Congress' policy against [federal] judicial resolution of abstract [state] tax controversies." *Regan*, 465 U. S., at 394 (O'CONNOR, J., concurring in judgment). This unfortunate result deprives state courts of the first opportunity to hear such cases and to grant the relief the Constitution requires.

For the foregoing reasons, with respect, I dissent.