# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued February 10, 2005          Decided June 17, 2005

No. 03-5369

SENIOR RESOURCES,
APPELLANT

BARBARA BARLOW, SAN ANTONIO, TX, *ET AL.*,
APPELLEES

v.

ALPHONSO JACKSON, SECRETARY,
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *ET AL.*,
APPELLEES

―――

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00983)

―――

*Gary M. Hnath* argued the cause for the appellant. *John F. Cooney* was on brief.

*Marina Utgoff Braswell*, Assistant United States Attorney, argued the cause for the federal appellee. *Kenneth L. Wainstein*, United States Attorney, and *Michael J. Ryan*, Assistant United States Attorney, were on brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance. *Brian M. Privor*

argued the cause for appellee Greater Kelly Development Authority. *Peter Buscemi* was on brief. *Mark A. Srere* entered an appearance.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: This case arises from the 1995 closure of Kelly Air Force Base (Kelly AFB) in San Antonio, Texas. Senior Resources, a Texas-based non-profit charitable and educational organization, filed suit contesting the planned conveyance of Kelly AFB property under the Defense Base Closure and Realignment Act and its amendments. 10 U.S.C. § 2687 note §§ 2901 *et seq.* (Base Closure Act or DBCRA). Senior Resources' complaint asserted seven constitutional and statutory claims against the Secretaries of the Departments of Housing and Urban Development (HUD), Defense (DOD) and the Air Force (Federal Appellees) for their roles in approving the Kelly AFB redevelopment plan. The district court permitted the Greater Kelly Development Authority (GKDA), a body created to oversee the distribution of Kelly's surplus property, to intervene as a defendant. Only the district court's grant of summary judgment to the Federal Appellees on Senior Resources' claim under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, is before us on appeal. Because we find that the Federal Appellees acted properly under both the Base Closure Act and the APA, we affirm the judgment of the district court.

## I. STATUTORY BACKGROUND

After the decision to close or realign a military base is finalized, the distribution of the base's real and personal property and facilities to private or local government entities is controlled by the Base Closure Act. The Base Closure Act requires the DOD to recognize "[a]s soon as practicable" a Local Redevelopment Authority (LRA) to oversee the formulation of

a redevelopment plan and the conveyance of property. 24 C.F.R. § 586.20(a). *See also* 10 U.S.C. §2687 note § 2905(b); 24 C.F.R. § 586.5. Once the LRA is recognized, the DOD Secretary determines what base property remains useful either to the military or to another federal agency and designates the property that does not serve a continuing military or federal use as "excess property or surplus property." 10 U.S.C. § 2687 note § 2905(b)(7)(B)(i). The LRA then publicizes the available property and consults with a variety of community groups to draft a redevelopment plan intended to mitigate the economic dislocation caused by the base closing. *Id*. note § 2905(b)(7)(C). Community groups such as "[s]tate and local governments, representatives of the homeless, and other interested parties" with a development proposal for a particular piece of surplus property submit a "notice of interest" (NOI) to the LRA that describes the applicant's "need" for the property. *Id*. note § 2905(b)(7)(C)(i).

Representatives of the homeless (ROHs) are given a semi-privileged status under the Base Closure Act.[1] The LRA is obligated to "consult with representatives of the homeless … and undertake outreach efforts to provide information on the buildings and property to representatives of the homeless."

---

[1] We note that the status of ROHs under the Base Closure Act is less privileged than in the past. Before the 1994 amendments to the DBCRA, surplus government property was allocated according to the McKinney Act, 42 U.S.C. §§ 11301 *et seq.*, which gave homeless assistance organizations priority status. 42 U.S.C. §§ 11411–12. The Base Closure Community Redevelopment and Homeless Assistance Act of 1994, Pub. L. No. 103-421, 108 Stat. 4346 (1994) (codified at 10 U.S.C. § 2687, note §§ 2901–2914), amended the DBCRA to permit the LRA to balance the community's competing interests in encouraging economic redevelopment and providing for the needs of the homeless, no longer automatically granting priority to homeless assistance organizations. *See* 140 Cong. Rec. S14457, S14461 (daily ed. Oct. 6, 1994) (statements of Sen. Pryor and Sen. Dole).

*Id*.note § 2905(b)(7)(C)(iii)(I)-(II). The Base Closure Act provides guidance to ROHs regarding the information to be included in an NOI and to the LRA regarding the evaluation of the NOI. A Notice of Interest is to include:

> (I) A description of the homeless assistance program that the representative proposes to carry out at the installation.

> (II) An assessment of the need for the program.

> (III) A description of the extent to which the program is or will be coordinated with other homeless assistance programs in the communities in the vicinity of the installation.

> (IV) A description of the buildings and property at the installation that are necessary in order to carry out the program.

> (V) A description of the financial plan, the organization, and the organizational capacity of the representative to carry out the program.

> (VI) An assessment of the time required in order to commence carrying out the program.

10 U.S.C. § 2687 note § 2905(b)(7)(E)(i). The LRA is instructed to "consider the interests in the use to assist the homeless of the buildings and property at the installation that are expressed in the notices submitted to the redevelopment authority." *Id*. note § 2905(b)(7)(F)(i). After completing the redevelopment plan, the LRA must submit a copy of the plan both to HUD and to the DOD. *Id*. note § 2905(b)(7)(G)(i). The

LRA's submission must include, *inter alia*, "[a]n assessment of the manner in which the redevelopment plan balances the expressed needs of the homeless and the need of the communities in the vicinity of the installation for economic redevelopment and other development." *Id*. note § 2905(b)(7)(G)(ii)(V).

After the LRA submits the redevelopment plan to the agencies for approval, the HUD Secretary reviews and approves the plan. *Id*. note § 2905(b)(7)(H)(i). The Secretary must

> determine whether the plan, with respect to the expressed interest and requests of representatives of the homeless –
>
> (I) takes into consideration the size and nature of the homeless population in the communities in the vicinity of the installation, the availability of existing services in such communities to meet the needs of the homeless in such communities, and the suitability of the buildings and property covered by the plan for the use and needs of the homeless in such communities;
>
> (II) takes into consideration any economic impact of the homeless assistance under the plan on the communities in the vicinity of the installation;
>
> (III) balances in an appropriate manner the needs of the communities in the vicinity of the installation for economic redevelopment and other development with the needs of the homeless in such communities;

(IV) was developed in consultation with representatives of the homeless and the homeless assistance planning boards, if any, in the communities in the vicinity of the installation; and

(V) specifies the manner in which buildings and property, resources, and assistance on or off the installation will be made available for homeless assistance purposes.

*Id*. In addition, the Secretary must "be receptive to the predominant views on the plan of the communities in the vicinity of the installation covered by the plan." *Id*. note § 2905(b)(7)(H)(ii). If he finds that the proposed redevelopment plan fails to meet the statutory requirements, he must explain the plan's deficiencies and provide the LRA ninety days to cure them. *Id*. note § 2905(b)(7)(H)(v), (b)(7)(I); 24 C.F.R. § 586.35(c)-(d). If the plan is approved, the DOD is required to dispose of the surplus property in accordance with the plan. 10 U.S.C. § 2905(b)(7)(K)(i); 24 C.F.R. § 586.45(c).

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1995, the Defense Base Closure and Realignment Commission designated a substantial portion of Kelly Air Force Base to be closed and realigned under the DBCRA. The complex contained nearly 1,300 acres of land and 500 buildings, including housing, rental units, office, commercial and industrial space totaling roughly 12 million square feet. The Greater Kelly Development Authority was formed to serve as the LRA for the redevelopment of the facilities and property.[2] The GKDA, in

---

[2] The Greater Kelly Development Authority (GKDA) is the successor in interest to the Greater Kelly Development Corporation (GKDC). Like the district court, we use "GKDA" to refer to both the GKDC and the GKDA.

turn, formed a citizens advisory panel to review the submitted NOIs and to make recommendations. Senior Resources submitted its initial NOI as a representative of the homeless in September 1996. The GKDA, however, tabled Senior Resources' NOI because the advisory panel determined that Senior Resources did not qualify for ROH status under the Base Closure Act due to its inexperience in serving the homeless. The GKDA submitted a redevelopment plan for HUD's approval that did not include Senior Resources' NOI. HUD approved the plan in June 1997. Senior Resources then brought suit to enjoin the implementation of the plan. *See Senior Resources v. Cuomo*, No. 97-1445 (D.D.C. May 4, 1998). The district court determined that the GKDA had improperly rejected Senior Resources' NOI and remanded the case to HUD for further action. *Id.* at 16.

In response, HUD withdrew its approval of the plan and instructed the GKDA to reconsider the NOIs submitted by Senior Resources and other representatives of the homeless. In particular, HUD recommended that the GKDA publicize the criteria by which it planned to evaluate the submissions. On remand, the GKDA issued a statement of the evaluation criteria it intended to use with respect to NOIs submitted by representatives of the homeless, including the following:

> Consideration of the skills and knowledge of the organization's personnel to carry out the proposed program, the history of the organization in running similar programs, the plausibility of the organization's ability to generate the funding required to maintain the program, and the extent to which there are firm commitments from other organizations or people to ensure the program will succeed.

GKDA Memorandum Re: Evaluation Criteria Clarification (Aug. 14, 1998).  According to the GKDA, these criteria were intended to fulfill the statutory mandate to consider the "description of the financial plan, the organization, and the organizational capacity of the representative to carry out the program."  10 U.S.C. § 2687 note § 2905(b)(7)(E)(i)(V).

Senior Resources resubmitted its NOI as did eight other homeless assistance organizations.  Of those, three eventually withdrew their applications.  Senior Resources' proposal was elaborate, requiring 344,970 square feet of warehouse space in nine buildings, along with fifteen housing units, 53.1 acres of land and some personal property.[3]  Its NOI described two programs to make use of the requested property: the Homeless Opportunities Program for Employment (HOPE), to provide education, shelter, social services and job training; and the Homeless Occupational Manufacturing Enterprise (HOME), to transform part of the property into a facility to manufacture modular homes.  Senior Resources' proposal required substantial financial investment; the HOME project entailed an estimated $1.5 million in start-up costs alone.  After reviewing each NOI, the citizens advisory panel recommended granting the requests of 4 of the other 5 ROHs (with some modifications) but rejected Senior Resources' NOI.  The panel found that, given the complexity of its proposal, Senior Resources lacked both the necessary experience and financing.  In addition, it found that Senior Resources had provided insufficient detail regarding financing, a business plan and its organizational capacity.  The GKDA followed the panel's recommendation.

The GKDA then resubmitted its master redevelopment plan for HUD's approval in December 1998.  HUD did not immediately approve the plan.  Instead, on February 1, 1999,

---

[3] The other five organizations combined requested roughly 75,000 square feet of office or warehouse space in addition to personal property.

HUD directed the GKDA to provide more detail regarding its decision balancing the "needs of the community" with those of the homeless. Ltr. from F. Karnas, HUD, to P. Roberson, GKDA (Feb. 1, 1999) (citing 24 C.F.R. § 586.30(b)(4)(ii)) at 2. After the GKDA amended the plan to comply with HUD's request, HUD temporarily suspended its review and instructed the GKDA to negotiate with Senior Resources. After several months, the negotiations proved unsuccessful and on April 18, 2001 HUD issued its formal approval of the redevelopment plan, stating that "with respect to the expressed interests and requests of the ROHs, [GKDA's plan] appropriately balances the relative needs for economic redevelopment and homeless assistance." HUD specifically noted Senior Resources' lack of guaranteed funding for its project in approving the GKDA's decision to deny Senior Resources' NOI.

On May 9, 1999, Senior Resources filed suit and moved for preliminary injunctive relief to enjoin the distribution of the Kelly AFB property. The district court denied the requested relief, finding Senior Resources unlikely to succeed on the merits. *Senior Resources v. Martinez*, No. 01-0983 (D.D.C. May 31, 2001). Nevertheless, the parties agreed not to distribute the surplus property pending judicial resolution of the dispute. On October 20, 2003, the district court granted summary judgment to the defendants. It held that the GDKA had employed appropriate selection criteria in evaluating the NOIs and that HUD's approval of the redevelopment plan was consistent with the statutory requirements of the Base Closure Act and the APA. Senior Resources timely filed a notice of appeal.

### III. ANALYSIS

We review a district court's review of agency action *de novo*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002), and will uphold agency action unless it is shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). Senior Resources asserts two errors on appeal: first, that the district court misinterpreted the Base Closure Act by not requiring HUD to perform an independent assessment of the needs of the San Antonio area's homeless population before approving the GKDA's redevelopment plan; and second, that HUD's approval of the redevelopment plan was arbitrary and capricious because the GKDA employed criteria in addition to those listed in the DBCRA in evaluating the NOIs submitted by representatives of the homeless. Neither of Senior Resources' arguments withstands scrutiny.

The district court found that Senior Resources' argument that "HUD should have conducted an independent evaluation of the needs of the homeless" is "not supported by the language of the Base Closure Act itself." We agree. The DBCRA requires HUD to:

> determine whether the plan, with respect to the expressed interest and requests of representatives of the homeless –
>
> (I) takes into consideration the size and nature of the homeless population in the communities in the vicinity of the installation, the availability of existing services in such communities to meet the needs of the homeless in such communities, and the suitability of the buildings and property covered by the plan for the use and needs of the homeless in such communities;
>
> (II) takes into consideration any economic impact of the homeless assistance under the plan on the communities in the vicinity of the installation;

(III) balances in an appropriate manner the needs of the communities in the vicinity of the installation for economic redevelopment and other development with the needs of the homeless in such communities;

(IV) was developed in consultation with representatives of the homeless and the homeless assistance planning boards, if any, in the communities in the vicinity of the installation; and

(V) specifies the manner in which buildings and property, resources, and assistance on or off the installation will be made available for homeless assistance purposes.

10 U.S.C. § 2687 note § 2905(b)(7)(H)(i). In contrast to the detailed description of the factors HUD is required to evaluate, the DBCRA does not specify the manner in which HUD is to carry out this review, much less require that HUD independently verify the accuracy of the NOIs submitted by representatives of the homeless. The DBCRA commands HUD to review the plan "with respect to the *expressed* interest and requests of representatives of the homeless." *Id*. (emphasis added). If the term "expressed" is to retain any meaning within the statutory framework, it must refer to the material included in the ROHs' NOIs. Requiring HUD to evaluate the plan based on its own assessment of the conditions of the homeless, as Senior Resources advocates, rather than the NOIs, would read the term "expressed" out of the statute—a result contrary to basic principles of statutory interpretation. *See Hibbs v. Winn*, 124 S. Ct. 2276, 2285–86 (2004) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting 2A

N. Singer, Statutes and Statutory Construction § 46.06, pp. 181-186 (rev. 6th ed. 2000))).

The Base Closure Act instead gives HUD a good deal of discretion: HUD is to ensure that the plan "takes into consideration" and "balances in an appropriate manner" the "expressed interest" of the homeless. 10 U.S.C. § 2687 note § 2905(b)(7)(H)(i). The record is clear that HUD met its statutory burden. As part of its redevelopment plan, the GKDA submitted an extensive "homeless assistance submission" that examined in detail the submission of each ROH and explained the rationale behind its decision to accommodate or reject each NOI. HUD went out of its way to ensure adequate consultation between the GKDA and Senior Resources, suspending its approval process for several months to permit further negotiations between the two. Moreover, HUD discussed the balance between the need for job creation and the need to assist the homeless extensively in its approval, devoting eight pages to the topic generally, one and one-half pages of which is directed to Senior Resources' NOI alone. Specifically, HUD found that "Senior Resources failed to demonstrate … that there was some assurance to believe that this organization was capable of implementing, managing and producing the claimed results … to justify the commitment of the extensive resources to its venture." Memorandum of Decision, Kelly AFB, San Antonio, TX (Apr. 18, 2001) at 7. In light of the DBCRA's broad language, we cannot view HUD's approval of the balance the GKDA struck between economic development and the needs of the homeless as arbitrary or capricious under the APA. 5 U.S.C. § 706(2)(A).

Nor does the GKDA's publication of detailed criteria it planned to use to evaluate ROHs' submissions undermine HUD's approval. The Base Closure Act requires any NOI filed by a ROH to contain "[a ]description of the financial plan, the organization, and the organizational capacity of the representative [of the homeless] to carry out the program." 10

U.S.C. § 2687 note § 2905(b)(7)(E)(i)(V). During the planning process, the GKDA announced that it intended to evaluate a NOI according to the following criteria:

> Consideration of the skills and knowledge of the organization's personnel to carry out the proposed program, the history of the organization in running similar programs, the plausibility of the organization's ability to generate the funding required to maintain the program, and the extent to which there are firm commitments from other organizations or people to ensure the program will succeed.

Memorandum from the GKDA to ROHs (Aug. 14, 1998). Senior Resources contends that these criteria exceed the GKDA's statutory authority and therefore HUD's approval of the redevelopment plan that applied the criteria in allocating resources was arbitrary and capricious. Yet the GKDA's criteria hardly differ from the Base Closure Act's. The DBCRA requires an ROH to submit a "financial plan," 10 U.S.C. § 2687 note § 2905(b)(7)(E)(i)(V), and the GKDA's criteria merely address the ROH's ability to "generate" the necessary funding. The same holds true for the criteria related to organizational strength. The GKDA's evaluation of organizational capacity using the ROH's past success and the capacity of its current employees fits squarely within the statutory scheme. *Id*. Thus, the specific criteria employed by the GKDA in evaluating an ROH's notice of interest provide no basis for overturning HUD's approval of the redevelopment plan for Kelly AFB.

For the foregoing reasons, the district court's grant of summary judgment to the defendants is affirmed.

*So ordered.*