RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

Supreme Court of Kentucky

2017-SC-000041-DG

THE TRAVELERS INDEMNITY COMPANY                          APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.           CASE NO. 2015-CA-001892-MR
WARREN CIRCUIT COURT NO. 14-CI-00954


CHARLES ARMSTRONG, ADMINISTRATOR OF                     APPELLEE
THE ESTATE OF CRAIG ARMSTRONG



AND                     2017-SC-000042-DG



MARTIN CADILLAC, INC. D/B/A/ MARTIN                     APPELLANT
DOCGE JEEP CHRYSLER


ON REVIEW FROM COURT OF APPEALS
V.           CASE NO. 2015-CA-001892-MR
WARREN CIRCUIT COURT NO. 14-CI-00954


CHARLES ARMSTRONG, ADMINISTRATOR OF                     APPELLEE
THE ESTATE OF CRAIG ARMSTRONG




**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING AND REINSTATING**

Charles Armstrong sued Martin Cadillac, Inc., D/B/A/ Martin Dodge Jeep Chrysler (Martin); The Travelers Indemnity Company (Travelers), Martin's insurer; the Estate of Jonathan Elmore; State Farm Mutual Automobile Insurance Company (State Farm); and News Publishing, LLC, in Warren Circuit Court for the wrongful death of his son, Craig Armstrong. Charles served as administrator of Craig's estate.[1] ABC Bowling Green, LLC (ABC) was also later added as a party.[2] Elmore was driving the vehicle in which Craig was a passenger; both Elmore and Craig were killed in the accident. It is undisputed that Elmore caused the wreck. A number of parties were sued, including each of the parties' respective insurance companies, all in connection with who owned, operated, or was financially responsible for the vehicle Elmore was driving. The Warren Circuit Court granted summary judgment to Travelers and Martin, finding that Elmore was the owner of the vehicle and thus, Martin, and by extension, Travelers, were not financially liable for the loss. After the Court of Appeals reversed, we granted discretionary review to examine Kentucky Revised Statute (KRS) 186A.220 and determine the implications of the statutory language to the sale of the vehicle in question.

---

[1] For clarity, we shall refer to the arguments and actions of Charles as administrator of Craig's estate collectively as "Armstrong."

[2] Martin filed a third-party complaint against ABC, naming it as a third-party defendant. ABC was dismissed as a party after Martin was granted summary judgment and dismissed from the proceedings. ABC was not a party to this appeal but was granted to leave to file an amicus brief.

2

# I. BACKGROUND

On November 30, 2013, Martin, a licensed motor vehicle dealer, accepted a 1996 Chevrolet Cavalier (the vehicle) in trade. On December 6, 2013, Martin gave the vehicle to ABC to be sold at an auction. That same day, Terrez DeWalt (DeWalt), representative for DeWalt Auto Sales (DeWalt Auto), a licensed motor vehicle dealer, placed the highest bid for the vehicle. DeWalt took possession of the vehicle on the same day. The title had not been provided to ABC, nor was it provided to DeWalt or DeWalt Auto. On December 26, 2013, Martin completed the statutorily required Notice to Clerk of Acquisition, requesting the county clerk to record title assignment. Martin concedes that this paperwork was not timely filed; dealers must notify the county clerk of the assignment of vehicles to the dealership within fifteen days of acquiring the vehicle. KRS 186A.220(1). This assignment by Martin was not recorded and noted in the online system with the county clerk until January 2, 2014.

On January 19, 2014, Elmore purchased the vehicle from DeWalt Auto. He paid in cash. On January 20, 2014, he returned and showed DeWalt Auto proof of insurance,[3] pursuant to KRS 186A.220(5), and took physical possession of the vehicle. On January 24, 2014, Martin delivered paperwork transferring title to ABC and ABC delivered a check to Martin for the sale of the vehicle. ABC did not note receipt of the paperwork in its system until March

---

[3] Elmore was insured by Nationwide in a policy with $100,000 per incident and $50,000 per person limits. Nationwide delivered the full $50,000 of its policy limitation to the Warren Circuit Court Clerk as the policy was undisputedly in effect at the time of the fatal car accident in this case.

3

18, 2014 but representatives admitted during discovery that this seems to be in error and the paperwork was received in January.

On April 5, 2014, Elmore was driving the vehicle, delivering newspapers for News Publishing, LLC. Craig was riding in the vehicle as a passenger. Elmore pulled into the path of another vehicle at an intersection and the vehicle was hit by the oncoming driver. Both Elmore and Craig were fatally injured. Charles brought this suit in his capacity as administrator of Craig's estate.

The main issue before the circuit court was who was the statutory "owner" of the vehicle at the time of the collision, and thus, which insurance company was primarily responsible for liability coverage. According to KRS 186.010(7)(a), the "owner" of a vehicle is "a person who holds the legal title of a vehicle or a person who pursuant to a bona fide sale has received physical possession of the vehicle subject to any applicable security interest." At the time of the wreck, the title was still in Martin's name as it had been assigned to the dealership at trade-in. However, it is also undisputed that Martin no longer had physical possession of the vehicle. KRS 186.010(7)(c) dictates that "[a] licensed motor vehicle dealer who transfers physical possession of a motor vehicle to a purchaser pursuant to a bona fide sale, and complies with the requirements of KRS 186A.220, shall not be deemed the owner of that motor vehicle solely due to an assignment to his dealership or a certificate of title in the dealership's name." Therefore, the ensuing question is: did Martin comply

4

with KRS 186A.220 in order to redeem the right in KRS 186.010(7)(c) and end

its identity as "owner" of the vehicle?

At the crux of both parties' argument as to liability is KRS 186A.220(5),[4]

which states:

> When [the dealer] assigns the vehicle to a **purchaser for use**, he shall deliver the properly assigned certificate of title, and other documents if appropriate, to such purchaser, who shall make application for registration and a certificate of title thereon. The dealer may, with the consent of the purchaser, deliver the assigned certificate of title, and other appropriate documents of a new or used vehicle, directly to the county clerk, and on behalf of the purchaser, make application for registration and a certificate of title. In so doing, the dealer **shall require from the purchaser proof of insurance** as mandated by KRS 304.39-080 before delivering possession of the vehicle. ...

(emphasis added). It is undisputed that Martin did not require proof of

insurance from either ABC or DeWalt upon the purchase of the vehicle.

Armstrong argues that Martin failed to strictly comply with this statutory

provision; therefore, it is unable to claim the exception of KRS 186.010(7)(c)

and Martin is still the legal "owner" of the vehicle for insurance liability. Martin

and Travelers, however, argue that either (1) the "purchaser for use" language

in the requirement means that it only applies in dealer-to-consumer sales,

rather than dealer-to-dealer transactions or (2) if Martin was required to verify

insurance, DeWalt's later compliance with the requirement in the sale to

Elmore overrides any liability Martin may have had.

---

[4] The statute was recently amended in 2016. At the time of the vehicle collision, this is the language of the statute. The amendments divide this section into several subsections but do not materially alter the requirements.

5

The circuit court interpreted the statute the same as Martin and Travelers. In its order, the court interpreted "purchaser for use" as "a purchaser who intends to use the vehicle." The court went further to limit the application to "purchasers who intend to use the car by driving it." DeWalt was not a purchaser for use under this definition and Martin was not required to verify the buyer's insurance. As such, under KRS 186.010(7)(c), Martin could not be held the "owner" on the sole basis of title being in its name. Elmore procured the vehicle in a bona fide transaction and there, the seller, DeWalt Auto, did comply with the requirements of KRS 186A.220(5). As such, Elmore was the statutory "owner" of the vehicle, even though title was still in Martin's name. The circuit court also dismissed all claims of bad faith against Travelers after this ruling.

The Court of Appeals interpreted the statute differently. It determined that "[t]he statutory duty to obtain proof of insurance before delivering possession of the vehicle to the purchaser applies even when a dealer sells the vehicle to another dealer," relying upon another Court of Appeals decision, *Calhoun v. Provence*, 395 S.W.3d 476 (Ky. App. 2012). The Court determined that Martin showed a "wholescale disregard for the statutory requirements" and such disregard "flies in the face of longstanding Kentucky jurisprudence requiring strict statutory compliance." It found that Martin was required to verify proof of insurance before the buyer took possession of the vehicle. The Court of Appeals did not define or explain the meaning of "purchaser for use," stating only that dealers also "use vehicles on their lot for a variety of purposes,

6

including sales for profit." It also held that the delay in transferring title by both Martin and DeWalt Auto was pivotal to ownership and unclear from the record. It reversed the grant of summary judgment and remanded for the trial court to conduct further proceedings on whether Martin promptly complied with its statutory requirements. Based on this finding, it also reversed the dismissal of the bad faith claims.

## II. STANDARD OF REVIEW

The primary issue now before the Court is interpretation of KRS 186A.220. The construction and application of statutes is a matter of law, which we review *de novo*, *Bob Hook Chevrolet Isuzu, Inc. v. Com. Transp. Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998), without any deference to the interpretation afforded by the circuit court. *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. App. 1998) (citing *Louisville Edible Oil Products, Inc. v. Revenue Cabinet Commonwealth of Kentucky*, 957 S.W.2d 272 (Ky. App. 1997)); *see also Jefferson County Bd. Of Educ. V. Fell*, 391 S.W.3d 713, 718 (Ky. 2012) (citing *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007)).

## III. ANALYSIS

### A. KENTUCKY IS A CERTIFICATE OF TITLE STATE, BUT THERE IS AN EXCEPTION.

Pursuant to KRS Chapter 186A, and with the chapter's effectuation, "Kentucky is a certificate of title state for the purposes of determining ownership of a motor vehicle and requiring liability insurance coverage." *Potts*

7

*v. Draper*, 864 S.W.2d 896, 898 (Ky. 1993). Unless certain statutory provisions are met, "[t]he owner of a motor vehicle is the title holder[.]" *Id.* "The adoption of K.R.S. Chapter 186A ... had the effect of changing the law of Kentucky from an equitable title state to a certificate of title state for the purposes of determining ownership of a motor vehicle for liability insurance requirements." *Id.* Thus, the title owner would normally be considered the statutory owner of the vehicle and that owner's insurance company would be liable in certain circumstances. However, in 1994, the legislature added the language at issue in this case in KRS 186A.220(5), "creat[ing] an exception to the general statutory scheme that makes the title holder the owner of a vehicle for insurance purposes." *Auto Acceptance Corp. v. T.I.G. Ins. Co.*, 89 S.W.3d 398, 401 (Ky. 2002).

As previously quoted, KRS 186.010(7)(c) states that "[a] licensed motor vehicle dealer who transfers physical possession of a motor vehicle to a purchaser pursuant to a bona fide sale, and complies with the requirements of KRS 186A.220, shall not be deemed the owner of that motor vehicle solely due to an assignment to his dealership or a certificate of title in the dealership's name." This creates a clear exception to the certificate of title holder being the legal owner of a vehicle. Notably, the exception only applies to "licensed motor vehicle dealer[s]". The legislature clearly contemplated points where a dealer may still be a title holder but, in order to effectuate the efficient flow of commerce to buyers, intended that the actual buyer should be considered the "owner" even before the certificate of title has been recorded in that buyer's

8

name. However, to properly conserve the policy intent of KRS Chapter 186A, as well as the Motor Vehicle Reparations Act (MVRA), the General Assembly required the dealer to comply with certain requirements to avail itself of this exception and cut off its potential liability.

Those requirements are codified in KRS 186A.220. There are seven separate subsections to KRS 186A.220.

KRS 186A.220(1):

> Except as otherwise provided in this chapter, when any motor vehicle dealer licensed in this state buys or accepts such a vehicle in trade, which has been previously registered or titled for use in this or another state, and which he holds for resale, he shall not be required to obtain a certificate of title for it, but shall, within fifteen (15) days after acquiring such vehicle, notify the county clerk of the assignment of the motor vehicle to his dealership and pay the required transferor fee.

Notably here, the legislature made this section applicable to vehicles that a dealership accepts in trade or buys for the express purpose of *resale*. In those circumstances, the dealer is *not* statutorily required to obtain a certificate of title but is obligated to notify the county clerk of the vehicle's acquisition.

KRS 186A.220(2):

> Upon purchasing such a vehicle or accepting it in trade, the dealer shall obtain from his transferor, properly executed, all documents required by KRS 186A.215, to include the odometer disclosure statement thereon, together with a properly assigned certificate of title.

This section provides in obtaining "such vehicle[s,]" in other words, vehicles bought or accepted in trade for resale that have been previously registered or titled, the dealer must obtain all the documents under KRS 186A.215. These documents include the certificate of title from the transferor, which can then be

9

assigned to the dealership. KRS 186A.215 also outlines the requirements that both transferor and transferee must undertake to promptly and properly transfer title ownership in a vehicle between the parties. Here, the General Assembly chose to outline a different procedure when this kind of vehicle is accepted or bought by a licensed dealership. It still required the same documentation but allows an assigned certificate of title for the dealer to go forward.

KRS 186A.220(3):

> The dealer shall execute his application for assignment upon documents designated by the Department of Vehicle Regulation, to the county clerk of the county in which he maintains his principal place of business. Such clerk shall enter the assignment upon the automated system.

This statutory provision is simple and straightforward. The dealer is instructed to file the required documents in the county where he has his principal place of business. This portion also directs the clerk to enter such assignments into the automated system, allowing notice of such assignments for interested parties.

KRS 186A.220(4):

> The dealer shall retain the properly assigned certificate of title from his transferor, and may make any reassignments thereon until the forms for dealer assignment on the certificate of title are exhausted. The Department of Vehicle Regulation may, if it deems it warranted, provide a special document to allow for additional dealer assignments without requiring system generated documents.

This provision seems to be more of an as-needed allowance. It allows for dealers to reassign on the transferor's certificate of title or, as needed, obtain a special document to allow for additional assignments.

KRS 186A.220(5):

> When he assigns the vehicle to a purchaser for use, he shall deliver the properly assigned certificate of title, and other documents if appropriate, to such purchaser, who shall make application for registration and a certificate of title thereon. The dealer may, with the consent of the purchaser, deliver the assigned certificate of title, and other appropriate documents of a new or used vehicle, directly to the county clerk, and on behalf of the purchaser, make application for registration and a certificate of title. In so doing, the dealer shall require from the purchaser proof of insurance as mandated by KRS 304.39-080 before delivering possession of the vehicle. Notwithstanding the provisions of KRS 186.020, 186A.065, 186A.095, 186A.215, and 186A.300, if a dealer elects to deliver the title documents to the county clerk and has not received a clear certificate of title from a prior owner, the dealer shall retain the documents in his possession until the certificate of title is obtained.

KRS 186A.220(5) is the provision in question for this transaction. It is clearly a requirement for dealers. The "he" at the beginning refers to the "dealer" as antecedent. But what is unclear is what exactly the legislature meant by "purchaser for use".

KRS 186A.220(6-7) are directives to state departments and agencies in processing registration applications, certificates of title, and fees.

## B. KRS 186A.220(5) DOES NOT APPLY TO DEALER-TO-DEALER TRANSACTIONS.

It is clear to this Court, from an in-depth examination of the statutory language at issue, that a "purchaser for use" in KRS 186A.220(5) does *not* implicate transactions from dealer to dealer for the purpose of resale. The

11

exact meaning of "purchaser for use" is undefined in KRS Chapter 186A.

However, looking to the intent of the General Assembly, the statutory context,

other statutory provisions, and rules of construction, we can discern the

meaning. A purchaser for use is a consumer buyer; it does not include

licensed motor vehicle dealers that are purchasing vehicles for the sole purpose

of resale.

### a. The plain language of the statute is unclear.

"We must look first to the plain language of a statute and, if the language

is clear, our inquiry ends." *Seeger v. Lanham*, 542 S.W.3d 286, 291 (Ky. 2018)

(citing *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005)).

However, if a statute is "reasonably capable of being understood in more than

one sense," it is ambiguous and the Court must turn to other methods of

interpretation. *Jefferson County Bd. Of Educ.*, 391 S.W.3d at 723 (quoting *MPM

Financial Group, Inc. v. Morton*, 289 S.W.3d 193, 197 (Ky. 2009)). The

determinative phrase here is "purchaser for use." Purchaser is clear but "for

use" could have multiple meanings. "Use" in the Webster's dictionary is

defined both as a noun and a verb. The noun form is defined as "the act or

practice of employing something," and the verb form is "to put into action or

service" or "to avail oneself of." It is unclear exactly what "for use"

encompasses. The definition could be so expansive as to become gratuitous;

practically anything could be considered a "use" under a broad enough intent.

Thus, the definitional guidance provides no enlightenment as to the General

Assembly's intent here. It could mean an active "use" as in driving; it could

12

mean a passive "use" as in buying for investment purposes. The possibilities are endless. We must assume the words utilized by the legislature have purpose and significance. As such, we are forced to move beyond the plain language of the statute to ascertain the legislative meaning.

### b. The legislature intended an efficient system of sale and registration, while still protecting operators from uninsured drivers.

"The fundamental rule in statutory interpretation is to give effect to the legislative intent." *Kentucky Indus. Utility Customers, Inc. v. Kentucky Utilities Co.*, 983 S.W.2d 493, 500 (Ky. 1998) (citing *Wesley v. Bd. Of Educ. Of Nicholas County*, 403 S.W.2d 28 (Ky. 1966)). We interpret statutes "according to the plain meaning of the act and in accordance with the legislative intent." *Pate v. Department of Corrections*, 466 S.W.3d 480, 488 (Ky. 2015) (quoting *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky. 2002) (citing *Commonwealth v. Montaque*, 23 S.W.3d 629 (Ky. 2000))). KRS 446.080 also instructs that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature[.]"

KRS Chapter 186A was enacted to develop "[a]n automated motor vehicle and trailer registration and titling system[.]" KRS 186A.010(1). The system was intended:

> to enable Kentucky's county clerks to produce motor vehicle and trailer certificates of registration in their offices, and certificates of title in Frankfort, by automated means utilizing telecommunication terminals and associated devices supplied by the Commonwealth, to inhibit registration and transfer of stolen motor vehicles or trailers, to improve the capability of detecting and recovering such vehicles, to ensure development of a common vehicle information

13

> database to improve efficiency in auditing motor vehicle usage tax, license fee collections, and in collecting personal property tax to provide information to the traffic record system, and to provide improved security interest protected to potential creditors throughout Kentucky while simultaneously reducing the number of forms that must be processed and stored each year in Kentucky.

*Id.* This goal of an "efficient" system makes more sense in light of KRS 190.015, declaring "that the distribution and sale of vehicles within this state vitally affects the general economy of the state and public interest and the public welfare[.]" Finding this vital interest, the General Assembly found that it was imperative "to regulate and license dealers of vehicles doing business in this state, in order to prevent frauds, impositions, and other abuses upon its citizens, and to protect and preserve the investments and properties of the citizens of this state." *Id.* KRS 186A.220(5) also specifically cites to the insurance requirements of the MVRA, intertwining those legislative goals, as well. That Act was intended to create a better insurance system with adequate regulations, prompt payments to victims, and "guarantee [] continued availability of motor vehicle insurance at reasonable prices by a more efficient, economical and equitable system of motor vehicle accident reparations[.]" KRS 304.39-010. Succinctly, Kentucky's policy within the MVRA is "to keep uninsured motorists off Kentucky's roads." *Auto Acceptance Corp.*, 89 S.W.3d at 401 (quoting *Nantz v. Lexington Lincoln Mercury Subaru*, 947 S.W.2d 36, 38 (Ky. 1997)).

In many ways, the provisions of KRS Chapters 186 (Licensing of Motor Vehicles, Operators, and Trailers), 186A (Automated Motor Vehicle Registration System), 190 (Motor Vehicle Sales), and 304.39 (MVRA) work in concert to

14

protect consumers and drivers from various dangers: fraud, uninsured drivers, damages related to accidents, etc. Thus, it is important for this Court to recognize this context of a multi-faceted, multi-layer system that drivers are enmeshed in by buying and utilizing vehicles in Kentucky. Given these provisions, we must interpret the statute in order to accomplish the legislative goals of preventing uninsured drivers from endangering others on the roadways while also maintaining an efficient and economical system for consumers and businesses to conduct sales transactions for vehicles in the Commonwealth.

### c. The statutory scheme as a whole shows a difference between "purchaser for use" and a dealer purchase for "resale."

We presume that the General Assembly intended for the statutory scheme to be construed as a whole. *Hall v. Hospitality Resources, Inc.*, 276 S.W.3d 775, 784 (Ky. 2008) (citing *Lewis v. Jackson Energy Co-op Corp.*, 189 S.W.3d 87, 92 (Ky. 2005)). "General principles of statutory construction hold that a court must not be guided by a single sentence of a statute but must look to the provisions of the whole statute and its object and policy." *Cosby v. Commonwealth*, 147 S.W.3d 56, 58 (Ky. 2004) (quoting *County of Harlan v. Appalachian Reg'l Healthcare, Inc.*, 85 S.W.3d 607, 611 (Ky. 2002)).

The phrase "purchaser for use" only appears one other time in KRS Chapter 186A.[5] KRS 186A.120(1) states that an owner must apply for certificate of registration or title and a license plate in the county in which the

---

[5] In fact, the phrase only appears one other place in all of Kentucky's statutes other than these two statutes in KRS Chapter 186A. In KRS 235.220(4), there is reference to the process for a dealer assigning a motorboat to a "purchaser for use."

15

owner resides. However, "if a vehicle is purchased from a dealer other than in the county in which the *purchaser for use* resides, the purchaser, or the dealer on behalf of the purchaser, may make application for registration to the county clerk in either the county in which the purchaser resides, or in the county in which the dealer's principal place of business is located." *Id.* (emphasis added). The legislature here differentiated between a "purchaser for use['s]" *residence* and a dealer's principal place of *business.* The inference is that dealers, meaning places of business, are separate and distinct from a consumer, a "purchaser for use."

This differentiation continues in the different provisions of KRS 186A.220. KRS 186A.220(1) states that "when any motor vehicle dealer licensed in this state buys or accepts such a vehicle in trade, which has been previously registered or titled for use in this or another state, and *which he holds for resale,* he shall not be required to obtain a certificate of title for it" (emphasis added). Instead, in such circumstances, the dealer is required to file a notice with the county clerk. *See id.* The legislature has expressly provided that when a licensed motor vehicle dealer holds a vehicle for resale, the dealer is not required to obtain a certificate of title. However, in KRS 186A.220(5), when the vehicle is assigned to a "purchaser for use," that purchaser "shall make application for registration and a certificate of title thereon."[6] Of course,

---

[6] The Court of Appeals inferred from the language of the statute that the later stand-alone "purchaser" term rather than continuing to use the full phrase of "purchaser for use" throughout KRS 186A.220(5) referred to two separate entities. We do not find such an inference persuasive. After using the term "purchaser for use," the legislature then referred to "such purchaser," clearly referencing back to the

16

this provision also provides that upon express consent from the purchaser and proof of the purchaser's insurance, the dealer can obtain title and registration for the purchaser. However, what is important here is the mandatory *shall.* A purchaser for use is mandatorily required to obtain certificate of title and register the vehicle.

If a licensed dealer buying a vehicle for resale is the same as a purchaser for use, then there is an explicit conflict between sections 1 and 5. Section 1 provides that such a dealer is not required to obtain a certificate of title but section 5 mandates that the purchaser *shall* obtain the title. "When the application of two statutes leads to apparent conflict, we have a duty to harmonize them so as to give effect to both, if possible." *Spees v. Kentucky Legal Aid,* 274 S.W.3d 447, 450 (Ky. 2009) (citing *Kentucky Off-Track Betting, Inc. v. McBurney,* 993 S.W.2d 946 (Ky. 1999)). The only way to harmonize these two provisions is to understand that the intent was to treat dealers purchasing for resale *differently* than purchasers for use. A "purchaser for use" in KRS 186A.220(5) cannot be interpreted so expansively as to include the dealers who are purchasing or accepting traded vehicles for resale, as described in KRS 186A.220(1).

### d. The Motor Vehicle Commission has interpreted "purchaser for use" as a consumer.

"Judicial notice may be taken at any stage of the proceeding." Kentucky Rule of Evidence (KRE) 201(f). "A judicially noticed fact must be one not

---

phrase "purchaser for use." We can presume, then, that the entire section of KRS 186A.220(5) refers to the requirements for a transaction with a "purchaser for use."

17

subject to reasonable dispute in that it is either: (1) Generally known within the county from which the jurors are drawn, or, ... in which the venue of the action is fixed; or (2) Capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." KRE 201(b). This provision "merely codified the common law of Kentucky which recognized the authority of an appellate court to take judicial notice of an appropriate fact." *Doe v. Golden & Walters, PLLC,* 173 S.W.3d 260, 264 (Ky. App. 2005) (citation omitted). However, "judicial notice should be used cautiously on appeal so as not to subvert the rules concerning preservation of error." *Id.* (internal citation omitted). "A court may properly take judicial notice of public records and government documents, including public records and government documents available from reliable sources on the internet." *Polley v. Allen,* 132 S.W.3d 223, 226 (Ky. App. 2004) (citation omitted).

Martin and Travelers have asked this Court to take judicial notice of the Kentucky Motor Vehicle Commission Dealer Handbook. The Appellants have provided a copy of the handbook, in its entirety, as an exhibit to its briefs, and the handbook is readily available from the Motor Vehicle Commission's website online. KENTUCKY MOTOR VEHICLE COMMISSION, KENTUCKY MOTOR VEHICLE COMMISSION DEALER HANDBOOK (2014).[7] Given its portable document file type, the fact that it is produced and published by a statutorily-created commission,[8]

---

[7] This handbook can be found at https://mvc.ky.gov/Resources/DealerHandbook2014.pdf.

[8] *See* KRS 190.010 and KRS 190.020.

18

and its availability via a government website, we hold it is an appropriate material of which to take judicial notice under KRE 201.

Section VI of the Handbook is entitled "Vehicle Acquisition and Transfer Requirements by a Dealer." The handbook instructs dealers that they are not required to obtain titles for motor vehicles "acquired by a dealership for the purpose of resale" unless the transferring title document runs out of space for further transfers or is not a conforming document itself. *Id.* Depending upon "[w]hether a vehicle is 'titled' to a dealer or 'dealer assigned' to a dealer will have an impact on how the dealer is taxed for that vehicle. All vehicles titled in a dealership name as of January 1 of each year will be taxed at a rate considerably higher than if those same vehicles are dealer assigned in the dealership name." *Id.* The handbook also instructs that "[w]hen a dealer sells a used motor vehicle to a purchaser for use (a consumer), the dealer must also give to the purchaser a properly assigned certificate of title at the time of delivery" or obtain permission from the buyer for the dealer to make application for the title on the purchaser's behalf. *Id.* It also directs dealers that they must acquire proof of insurance from the buyer before delivering possession of the vehicle. The Motor Vehicle Commission thus interprets KRS 186A.220 as distinguishing between transactions to *consumers* and other transactions; it instructs dealers doing business in Kentucky of the same distinction.

### e. The usage tax statutes also show a legislative distinction between "purchaser for use" and a purchase for resale.

Martin and Travelers also argue that the provisions of KRS 138.460 and 138.470, outlining the motor vehicle usage tax and exceptions, shows the

legislative intent to demarcate the difference between "use" and "resale" by a dealer. KRS 138.460 sets the rate of taxation on every motor vehicle used in the state, as well as other provisions of the usage tax, including the time at which the tax is to be paid. However, previously registered or titled motor vehicles are exempt from this usage tax "when being sold or transferred to licensed motor vehicle dealers *for resale*." KRS 138.470(3) (emphasis added). These motor vehicles "*shall* be held for resale only." *Id.* (emphasis added).

Although Armstrong contends that the taxation rate for motor vehicles is inapplicable and irrelevant, the statutory context is persuasive. Once again, we see the General Assembly distinguishing between how vehicles should be treated, depending on whether they are being "used" on the roadways of Kentucky or held "for resale." These are separate statutory chapters and we must look to the guidance of such language cautiously. However, we can infer some insight into the General Assembly's intent in the way it phrased these statutory provisions. Once again, we notice a common theme: a divergence in the treatment of vehicles sold for use and vehicles held by dealers for resale.

"If the vehicle is one which is purchased by the dealer for use, and not for resale, he is required, just as the individual is, to register that vehicle ... and pay the ad valorem tax when registered or upon renewal." *Kling v. Geary*, 667 S.W.2d 379, 383 (Ky. 1984). This Court, in determining the constitutionality of these taxes, stated that the ad valorem tax on motor vehicles is applicable to "all persons, including an individual or a dealer, *who intend to operate the vehicle on the highways of this state*." *Id.* (emphasis

20

added). The Court stated that in a resale situation, "[t]he dealer is a mere conduit in the chain[.]" *Id.* Because the dealer is a "mere conduit", the exclusion of dealers from payment of tax liens was permissible. *Id.* at 384. The integral determination for registration and tax payment was whether "the vehicle [was] to be operated on [the] highways[.]" *Id.* This treatment is sensible in light of the policies and underlying purpose of these various acts: to protect drivers and citizens of the Commonwealth from uninsured drivers. If the vehicle is merely being held for resale and the dealer is nothing but a "conduit," there is no reason to treat that dealer the *same exact way* as a purchaser who will be operating the vehicle on the roadways of Kentucky. There is a clear reason to treat these two groups of people differently under these statutory schemes. The legislature's recognition of this fact is apparent from the taxing regulations and can be imparted into this Court's interpretation of KRS 186A.220(5).

### f. The broad interpretation by the Court of Appeals makes language of the statute meaningless.

"All parts of the statute must be given equal effect so that no part of the statute will become meaningless or ineffectual." *Lewis*, 189 S.W.3d at 92. "One of the most basic interpretative canons" of statutory interpretation is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal citation omitted)). "We presume ... that the General

21

Assembly intended for the statute to be construed as a whole and for all its parts to have meaning." *King Drugs, Inc. v. Commonwealth*, 250 S.W.3d 643, 645 (Ky. 2008) (citing *Lewis*, 189 S.W.3d 87).

Armstrong proposes an exceptionally expansive interpretation of "purchaser for use." Its argument is that use could be for inventory, floor model, demo driver, for parts, or use in multiple ways to make a profit. The problem with this interpretation, however, is that it is so broad as to become superfluous. If everything can be a use, then why include the language at all? We presume every word within a statute to have some meaning. The General Assembly specifically included the phrase "for use" in this requirement. It is even more noteworthy considering the phrase occurs so sparingly throughout any other statute. Clearly, the addition was intentional and purposeful. We would be displaying a strain of judicial activism by interpreting such a broad and useless meaning in adopting the proposed view. We must discern the meaning of the language given the General Assembly's utilization of these words within the overall statutory context. Given the factors as we have described, we hold that "purchaser for use" is a distinct subset of purchasers from licensed motor vehicle dealers that are purchasing vehicles for resale.

### g. Purchase for use is different than purchase for resale.

Our inquiry does not end here, however. We must attempt to describe what a "purchaser for use" is and give guidance for transacting parties in the future. Given the General Assembly's specific distinction of *licensed* motor vehicle dealers purchasing or acquiring trades for *resale*, we hold that the term

22

"purchaser for use" encompasses all other purchasing transactions. We have no other legislative language from which to infer other exceptions to the rule. Thus, it must be that the General Assembly contemplated two kinds of transactions: purchases by licensed dealers (as evidenced by the specific reference to *licensed* dealers in KRS 186.010(7) and 186A.220(1)) for resale purposes and all other transactions. Even purchases by dealers for driving purposes would be included as a "purchaser for use." This meaning is also evidenced by this Court's language in *Kling.* 667 S.W.2d at 383 (The requirement for registration and taxation on motor vehicles is incumbent upon "all persons, including an individual or a dealer, *who intend to operate the vehicle on the highways of this state.*" (emphasis added)).

The intense examination of the word-by-word analysis of a statute tends to muddle the bigger picture of the statute's meaning. Thus, we now clarify exactly what this interpretation means. Because Kentucky is a certificate of title state, the title holder is normally considered the "owner" of the vehicle according to statutes. However, KRS 186.010(7) outlines a way that licensed motor vehicle dealers, despite being the title holder of the vehicle, will not be considered the "owner." If the transaction in question is to a purchaser for use, or a consumer buyer for use on the roadways of Kentucky, the dealer must comply with all the relevant requirements of KRS 186A.220, including section 5 to verify proof of insurance. However, if the transaction is to a licensed dealer intending the vehicle for resale, then the dealer must only

23

comply with KRS 186A.220, sections 1 to 4 in order to qualify for the exemption in KRS 186.010(7).

Armstrong raises a valid point in questioning this interpretation. He states that the interpretation "ignores the fact that a seller/dealer cannot ever know the intended use of a purchaser – even if that purchaser is another dealer." While at face value this seems accurate, the actual meaning is more theoretical than practical. When a transaction is happening, whether it be between a person coming to a car salesman to find the right vehicle or another dealer buying an older model from another dealer, the people involved in the transaction will understand the purpose of that transaction. However, the courts should still hold the seller/dealer responsible for compliance with KRS 186A.220. Thus, if for some reason, a purchaser is believed to be a dealer buying for resale but is actually a purchaser for use, then the failure to ask for insurance as required by KRS 186A.220(5) could still leave that seller/dealer the statutory "owner" of the vehicle. It will be obligatory for courts to hold these sellers to their due diligence in making proper inquiries and responsible choices in these transactions. It will be up to dealers and sellers to make appropriate policy and procedure changes to comply with these requirements.

While this responsibility upon seller/dealers may seem burdensome, it is less burdensome than interpreting the insurance verification as being required in *all* transactions. It is also in concert with the policy delineated in *Gainsco Companies v. Gentry*, 191 S.W.3d 633 (Ky. 2006). The Court stated that "one obvious purpose of [KRS 186A.220] is to keep uninsured vehicles off Kentucky

24

roadways, [but] the language of the provision evidences a further goal of the General Assembly: to place the burden on the car dealer to procure proof of insurance coverage before possession is transferred." *Id.* at 637. That burden is still upon dealers, when the responsibility to procure proof of coverage is required. It is the dealer's burden to bear and if the dealer is mistaken or assumes that a licensed dealer is not purchasing for use, this does not shift that burden onto the other party. There will of course be equitable decisions left to the courts in rare circumstances (e.g. fraud on the part of the buyer) but, for the most part, the guiding policy is that the legislature has chosen to impart this responsibility upon licensed dealers. We cannot shift that policy. We must merely interpret the language in accordance with the policy. The clear language shows an intent to treat purchases for resale differently but that interpretation does not affect the dealer's continuing burden to verify insurance when the purchase is for use.

The language of *Gainsco* may be seen as broad, but the holding remains binding precedent, even given our holding today. The purposes of KRS 186A.220 are accurately described within *Gainsco*'s holding. In that case, the dealer/seller failed to verify the buyer's insurance and was, thus, the statutory "owner" of the vehicle for insurance purposes. We are merely refining the holding of the case to confirm that the specific provision in KRS 186A.220(5) refers to transactions involving "purchaser[s] for use" and does not include sales to licensed dealers for resale. In contrast to *Gainsco*, however, the oft-cited case by Armstrong, *Calhoun v. Provence*, must now be overruled so far as

25

it conflicts with today's holding. There, a dealer/seller, Legend Suzuki, sold a vehicle to another dealer/seller, Yaden's Auto Sales, without verifying Yaden's proof of insurance. *Calhoun*, 395 S.W.3d at 482-83. The court deemed this a failure under KRS 186A.220(5) and found that Legend Suzuki was still the "owner" of the vehicle. *Id.* at 483. The problem in this holding is that it does not appear that the meaning of "purchaser for use" was ever explained or argued in *Calhoun*. *See id.* at 482-83. Thus, we cannot say that under our reasoning today, the result would absolutely have been different. We cannot re-review all the materials, evidence, and arguments made before the Court of Appeals at that time. What we can confirm, however, is that in a sale from licensed dealer to licensed dealer for the sole purpose of resale, the seller is not required to verify proof of insurance.

Our holding and definition also advances the purposes of KRS Chapters 186, 186A, 190, and the MVRA. Allowing licensed dealers to continue to sell and buy without further encumbrances promotes the efficient distribution and sale of vehicles in our state, a "vital interest." KRS 190.015. It improves efficiency of the registration and title procedure for dealers while still protecting the important interests of the consumers buying those vehicles for personal use. This holding does not interfere with promoting the goals of the MVRA "to keep uninsured motorists off Kentucky's roads." *Auto Acceptance Corp.*, 89 S.W.3d at 401 (quoting *Nantz*, 947 S.W.2d at 38). Dealers purchasing for resale will not have those vehicles on Kentucky's roads; licensed dealers are required, by law, to have the proper insurance coverage to maintain their

26

licenses. We are persuaded that this continues to protect Kentucky's drivers while fostering the growth and success of Kentucky's auto industry, a critical interest for many of Kentucky's citizens.

## C. STRICT COMPLIANCE WITH KRS 186A.220.

In *Ellis v. Browning Pontiac-Chevrolet-GMC Truck-Geo, Inc.*, the Court of Appeals held that there was a "promptness requirement ... [for] all transfers including those covered by KRS 186A.220." 125 S.W.3d 306, 308 (Ky. App. 2003). The Court was persuaded by the possibility "that unjustified delays in transferring title could potentially result in uninsured drivers on our roadways." *Id.* The Court determined the dealer, Browning, in a dealer to consumer transaction, "could relinquish possession of the vehicle before taking the necessary title transfer documents to the county clerk. However, to comply with the language and intent of the entire titling scheme, it was required to use due diligence in making a prompt transfer." *Id.* This Court has also specifically held that a dealer must "strictly comply with the statutory procedures of KRS 186A.220(5)" in order to "validly transfer ownership." *Gainsco*, 191 S.W.3d at 637. In *Gainsco*, this Court held that strict compliance required a dealer to verify insurance of the purchaser for use "beyond mere assumption or knowledge." *Id.* at 638.

We have already held that the verification of insurance requirement in KRS 186A.220(5) does not apply to dealer-to-dealer transactions in purchases for resale. Thus, the strict compliance language in *Gainsco* is somewhat irrelevant. However, from the holdings in both *Gainsco* and *Ellis*, we must

27

determine whether strict compliance with the other provisions of KRS 186A.220 is required in dealer-to-dealer transactions to validly transfer the vehicle. Martin has admitted that it did not *strictly* comply. Its notice under KRS 186A.220(1) was admittedly late. How does this affect the subsequent transfer to DeWalt?

To simply say that not following the letter of the law in KRS 186A.220 has no effect would undermine and diminish the legislative intent. This Court cannot say that failing to follow these requirements has no further effect or consequence to the seller/dealer. However, we also cannot, in accordance with legislative intent, determine that one failure to comply with a requirement in KRS 186A.220, sections 1 to 4, (e.g. filing the notice to the county clerk in 16 days, rather than 15) causes the seller/dealer to remain the statutory "owner" forever, without any recourse. Such a policy would bring the auto industry to a halt and cause a whirlwind of legal squabbles without merit, also undermining the goals of these statutory provisions.

"In order to determine whether strict compliance or substantial compliance is sufficient to satisfy a statutory provision, it first must be determined whether the applicable provision is mandatory or directory." *Knox County v. Hammons*, 129 S.W.3d 839, 842 (Ky. 2004). To determine whether a statute is mandatory or directory, the Court looks "not on form, but on the legislative intent, which is to be ascertained by interpretation from consideration of the entire act, its nature and object, and the consequence of construction one way or the other." *Id.* at 843 (quoting *Skaggs v. Fyffe*, 98

28

S.W.2d 884, 886 (Ky. 1936)). "[I]f the directions given by the statute to accomplish a given end are violated, but the given end is in fact accomplished, without affecting the real merits of the case, then the statute is to be regarded as directory merely." *Hammons*, 129 S.W.3d at 843 (quoting *Skaggs*, 98 S.W.2d at 886).

In *Gainsco*, this Court determined that the fact that the driver of the vehicle in the accident was insured was inconsequential to the seller/dealer's compliance. 191 S.W.3d at 637-38. This requirement for *strict* compliance stemmed from the finding that the General Assembly intended "to place the burden on the car dealer to procure proof of insurance." *Id.* at 637 (citing *Nantz*, 947 S.W.2d at 39)). In accordance with the policy we have previously outlined in *Gainsco* and *Ellis*, the purpose behind the construction of these statutes is to ensure that each vehicle on the roadway is properly and adequately insured. Thus, we hold firm to the determination that a dealer must strictly comply with the requirement in KRS 186A.220(5). However, as we have previously held, the requirement for proof of insurance is irrelevant in this dealer-to-dealer transaction. Thus, must the dealer *strictly* comply with the other requirements in KRS 186A.220, sections 1 to 4, or is *substantial* compliance sufficient?

The provisions in sections 1 to 4 of KRS 186A.220 are directory, rather than mandatory. By violating the strict requirements of the provisions (namely, the 15 day requirement) but still accomplishing the goal (notifying the clerk of the acquisition of the vehicle), the intention of the statute is still

29

upheld. We note that, in describing this statute as directory, this does not mean non-compliance is permissible.[9] If the dealer fails to comply, at all, then there is no compliance with KRS 186A.220 and the dealer is still the "owner." However, substantial compliance, *i.e.*, late compliance, may still allow the dealer to take advantage of the exception in KRS 186.010(7)(c). The intention of the legislature in those provisions was to effectuate an efficient registration and titling process. If a dealer complies with these requirements late, it does not vitiate the overarching goal. Thus, the statute is directory and substantial compliance is sufficient for those sections. A licensed dealer, therefore, can cure an untimely compliance with KRS 186A.220, sections 1 through 4, by complying at a later date. If an accident occurs *before* the dealer has complied (in which case, at that point, there would be *no* compliance rather than substantial compliance), that dealer will still be the statutory "owner" of the vehicle. If the dealer has complied before the accident, it can still avail itself of the exception in KRS 186.010(7)(c).[10] It, therefore, greatly behooves a dealer to timely comply with these requirements lest it be liable for damages before it complies.

---

[9] Additionally, the use of the word "shall" in these statutes does not automatically render a statutory provision as mandatory for the strict vs. substantial compliance analysis. *See Hammons*, 129 S.W.3d at 843.

[10] We reiterate our holding, however, in *Gainsco*, that the burden is on the dealer, when selling to a purchaser for use, to actively verify that the buyer has insurance before transferring possession of the vehicle. Failure to promptly comply with the requirements of KRS 186A.220(5) in a transaction with a purchaser for use cannot be cured and the dealer may still be considered the "owner" of the vehicle in question.

30

"[W]hen the proper legal documents are transferred from the dealer to the buyer, the responsibility for insurance coverage on the part of the dealer ceases." *Auto Acceptance Corp.*, 89 S.W.3d at 400-01 (quoting *Nantz*, 947 S.W.2d at 38-39 (citing *Potts*, 864 S.W.3d 896 and *Cowles v. Rogers*, 762 S.W.2d 414 (Ky. App. 1998))). This principle holds true. At the time of the accident in question, Martin had transferred the necessary paperwork to ABC as DeWalt's agent in the purchase transaction.[11] Martin had also sent the notice to the county clerk, despite it being untimely. At the time of the accident, Martin had substantially complied with all the relevant requirements of KRS 186A.220.[12] Martin, then, under KRS 186.010(7) cannot be deemed the owner of the vehicle solely because the title was still in Martin's name. Martin was not the owner of the vehicle at the time of the accident.

### D. BECAUSE TRAVELERS IS NOT RESPONSIBLE FOR COVERAGE, ARMSTRONG'S BAD FAITH CLAIMS WERE PROPERLY DISMISSED.

There are three established elements to a cause of action against an insurer for bad faith:

> (1) The insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the

---

[11] Travelers attached this grant of authority as Exhibit 4 to its Cross Motion for Partial Summary Judgment. It can be found in the trial court record, Volume IV, page 572. We would note, however, that neither ABC nor DeWalt are parties to this appeal. Thus, the effect of delivery of the title paperwork to ABC, *as DeWalt's agent* while simultaneously acting as Martin's agent, is neither raised nor properly before this Court. We, therefore, decline to address any such issue at this time.

[12] It does not appear that Armstrong conceded to Martin taking the documents to ABC in January 2014; but it appears uncontroverted from the record that, at least by March 2014, Martin had delivered the proper documentation to ABC for the transfer of title.

insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Kentucky Nat. Ins. Co. v. Shaffer*, 155 S.W.3d 738, 741-42 (Ky. App. 2004) (quoting *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (citations omitted)). "[I]t is sound principle that, in absence of a contractual obligation in an insurance policy for coverage, there can be no claim for bad faith." *Shaffer*, 155 S.W.3d at 742. Because we have determined that, given the meaning of "purchaser for use," Martin was not the owner of the vehicle at the time of the accident and, thus, Travelers had no contractual obligation for coverage on the vehicle, there was no obligation for Travelers to pay. Without that obligation, the bad faith claim must fail as a matter of law.

Additionally, this claim would fail as a matter of law under the second element: that the insurer "lack[ed] a reasonable basis in law or fact for denying the claim[.]" *Id.* (quoting *Wittmer*, 864 S.W.2d at 890). "[I]f a particular claim is 'fairly debatable,' the insurer is entitled to debate that claim regardless of whether the debate concerns a matter of fact or one of law." *Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Serv., Inc.*, 880 S.W.2d 886, 889-90 (Ky. App. 1994) (citing *Davis v. Allstate Insurance Co.*, 303 N.W.2d 596 (Wis. 1981) and *Anderson v. Continental Ins. Co.*, 271 N.W.2d 368 (Wis. 1978)). "If a genuine dispute does exist as to the status of the law governing the coverage question, the insured's claim is fairly debatable and the tort claim for bad faith based upon the insurer's refusal to pay the claim may not be maintained." *Empire Fire*, 880 S.W.2d at 890.

In *Empire Fire*, the Court of Appeals determined that, because "the fact that the coverage issue presented by this case was one of first impression in Kentucky," and there were multiple jurisdictions supporting opposite views, the issue was "fairly debatable." *Id.* Here, the parties presented an issue of first impression at the crux of who was responsible for coverage: what was intended by the General Assembly in stating a "purchaser for use"? The issue here, like in the Court of Appeals case, was fairly debatable. Under such circumstances, we cannot say that Travelers exhibited bad faith. The trial court properly dismissed these claims on Travelers' motion for summary judgment. We reverse the Court of Appeals holding remanding the claim and now reinstate the trial court's dismissal.

## IV. CONCLUSION

KRS 186.010(7) outlines an exception to the normal finding that the title holder of a motor vehicle is the "owner." To obtain consideration of that exception, the licensed motor vehicle dealer selling the vehicle must comply with all the relevant provisions of KRS 186A.220. However, the requirement of KRS 186A.220(5) specifically refers to "purchaser for use" and does not apply to transactions from dealer to dealer for the purpose of resale. The requirements of KRS 186A.220, sections 1 through 4, are directory and substantial compliance is sufficient. Before the time of the collision in the vehicle, Martin had substantially complied with these requirements. Martin qualified for the exception in KRS 186.010(7), even though it was the title holder of the vehicle, and was, therefore, not the "owner" of the vehicle.

33

Martin, and Travelers, were not responsible for coverage of the vehicle. The circuit court correctly found that Martin was not the owner of the vehicle and we reinstate its order granting summary judgment on all claims against Martin and Travelers.

Minton, C.J., Cunningham, Keller, Venters, Wright, JJ., and Clark and Royse, SJ., sitting. All concur. Hughes and VanMeter, JJ., not sitting.

COUNSEL FOR APPELLANT, THE TRAVELERS INDEMNITY COMPANY:

Michael Shea Maloney
Stephen Connor Keller
Schiller Barnes Maloney PLLC


COUNSEL FOR APPELLANT, MARTIN CADILLAC, INC., D/B/A MARTIN DODGE JEEP CHRYSLER:

Guy Edward Hughes
Robert Sean Quigley
Casey Bailey & Maines, PLLC


COUNSEL FOR APPELLEE:

Matthew James Baker


COUNSEL FOR AMICUS CURIAE, ABC BOWLING GREEN, LLC AND NATIONAL AUTO AUCTION ASSOCIATION, INC.:

Darell R. Pierce
Julie F. Shadoan
Pierce & Shadoan

Michael G. Abelow
Lauren Z. Curry
Sherrard Roe Voigt & Harbison, PLC


COUNSEL FOR AMICUS CURIAE, KENTUCKY AUTOMOBILE DEALERS ASSOCIATION:

Clayton B. Patrick
Patrick Law Firm